[No. F058589. Fifth Dist. Nov. 24, 2010.]

THE PEOPLE, Plaintiff and Respondent, v.
TANNEN SOOJIAN, Defendant and Appellant.

## COUNSEL

Geragos & Geragos, Mark Geragos; Cliff Gardner and Lazuli Whitt for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Brian G. Smiley, William K. Kim and Amanda D. Cary, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**CORNELL, Acting P. J.**—A jury convicted Tannen Soojian of various crimes resulting from an armed robbery of Joyce Ahumada and her son, Morgan Ahumada.[1] Joyce was shot during the robbery, sustaining serious injuries. The crimes for which Soojian was convicted included attempted murder (Pen. Code, §§ 187, 664)[2] and robbery (§ 211). Numerous enhancements also were found true.

Soojian's defense concentrated on showing inconsistencies in the prosecution's evidence to establish that he was not the perpetrator. During the prosecution's case, unexpected evidence was elicited that led Soojian and his counsel to suspect that Soojian's cousin, Aaron Bolin, was the perpetrator. Evidence was introduced in an attempt to establish Bolin's guilt. The jury rejected this evidence and found Soojian guilty as charged and found all enhancements true.

After the verdicts were reached, Soojian located additional evidence that implicated Bolin. Soojian moved for a new trial based on this newly discovered evidence. (§ 1181, subd. 8.) The trial court denied the motion.

In the first appeal (*People v. Soojian* (Mar. 16, 2009, F053842) [nonpub. opn.]), we reversed the order denying the new trial motion. We concluded that the trial court had utilized an incorrect standard when analyzing the motion and remanded the matter to the trial court to reconsider the new trial motion applying the correct standard.

On remand, the trial court again denied the motion. Soojian contends the trial court erred for two reasons. First, he argues the trial court erroneously refused to consider some of the evidence he presented. Second, he claims the trial court erroneously imposed on him the burden of establishing that he was entitled to a new trial only if he could establish that he probably would have been found not guilty if the new evidence had been presented to the jury. Instead, Soojian contends that all he was required to prove was a probability of a better result, which included a mistrial because the jury could not reach a verdict (i.e., a hung jury).

The People argue the trial court did not err in refusing to consider some of the evidence presented by Soojian. The People concede, however, that the

---

[1] We will refer to Joyce Ahumada and her son Morgan Ahumada by their first names, not out of disrespect but to ease the reader's task.

[2] All further statutory references are to the Penal Code unless otherwise indicated.

trial court imposed an incorrect burden on Soojian.[3] The People argue this error was not prejudicial and ask us to affirm the judgment.

As we shall explain, we agree with Soojian on both points and reversal is required. The difficult issue, in our view, is the appropriate remedy. Soojian argues the newly discovered evidence establishes he is entitled to a new trial as a matter of law and urges us to vacate the judgment and order a new trial. The People argue we should either affirm the judgment because the mistake was not prejudicial or remand to allow the trial court to rule on the motion utilizing the correct standard.

We conclude that in this case the judgment must be reversed and a new trial ordered. We are aware that it is unusual for an appellate court to conclude that newly discovered evidence entitles a defendant to a new trial as a matter of law. In this case, however, the evidence introduced at trial that implicated Soojian in the crimes, while sufficient to support the judgment, was far from overwhelming. We conclude the newly discovered evidence raises significant issues as to the correctness of the verdict. While there is more than sufficient evidence to retry Soojian, fairness and justice require that a verdict is reached only after a jury has heard all of the relevant evidence.

## FACTUAL AND PROCEDURAL SUMMARY

### I. *The Evidence Presented at the Trial*

On April 18, 2004, Joyce and Morgan were delivering the Sunday morning newspaper in Joyce's small pickup when she observed a vehicle behind her being driven erratically. The vehicle had its bright lights turned on and stayed behind Joyce's vehicle as she delivered papers. When Joyce stopped at a newspaper box at Calhoun Ranch, the vehicle passed her very slowly. As the vehicle passed, the driver turned his body around very slowly and Joyce could see his face. The vehicle then backed up and stopped beside Joyce's vehicle.

The vehicle was a very large club cab-type pickup with four doors. Its engine was loud like a diesel engine. The window of the front passenger door of the pickup opened. One person, a man, was in the pickup. He asked Joyce how to find Clovis. She responded that it was straight ahead. The man said he could not hear her and asked if he could get out and show her an address he was trying to find. Joyce agreed. As the driver approached, Joyce could see

---

[3] At oral argument, the People took the position that Soojian was required to establish that the new evidence would probably have resulted in the jury finding him not guilty, as opposed to a hung jury. No authority was cited to support this proposition.

his face. The pickup was on the pavement but pulled off slightly. The windows of the pickup were tinted, the floor was messy, and the interior smelled of stale cigarettes. The interior was a dark vinyl.

When the man arrived at the window of Joyce's vehicle, he leaned very close to Joyce and pointed a handgun at her face. He yelled at Joyce, stating that if she looked at him, he would shoot her. The man yelled at Morgan to stop looking at his face. The man stated he was there to rob Joyce. Joyce dropped her head down and told Morgan to give the man her wallet, which was in the glove compartment. Morgan gave the wallet to Joyce, and she handed it to the man. The man yelled repeatedly that if Joyce or Morgan looked at him, he would shoot them.

The man next instructed Joyce to get out of her vehicle. He opened the vehicle door and put the gun in Joyce's side when she got out of the vehicle. Morgan was instructed to stay in the vehicle. The man grabbed Joyce's arm and directed her around to the other side of the vehicle. Joyce kept her head down and did not look at the man. When the two arrived at the passenger side of the vehicle, the man ordered Morgan out of the vehicle. When Morgan got out of the vehicle, he dropped the paper route maps on the ground.

The three then walked to the man's pickup. When Morgan looked at the man, the man told him to stop and appeared to become upset. The man instructed Morgan to get into the bed of his pickup. Morgan climbed up on a very large tire and into the bed. The man then told Morgan to lie on his stomach. Morgan did so, with his head facing the tailgate.

The man then directed Joyce to the front passenger door, opened the door, and told her to get inside the cab. Joyce continued to keep her head down because she did not want to see or have the man start yelling again. She did, however, glance at his face as she was trying to convince him to release Morgan and her. Joyce was told to get on her knees on the floor facing the rear of the pickup. Joyce put her head down on the seat, and the man climbed in the pickup through the same door. The man paused while he was behind Joyce, and she could feel that he had an erection. The man moved over to the middle of the bench seat. The man next told Joyce to move next to his legs, but then he moved over to the driver's seat. He had the gun pointed at Joyce's head. Joyce noticed that the gearshift was on the steering column as the man attempted to put the vehicle into gear.

Joyce then exploded and started screaming "no." She tried to grab the keys or the gearshift to keep the pickup from going anywhere. The man was hitting Joyce in the head with the gun. Joyce felt the keys on the steering column. There were "quite a few" keys on the keyring. The man then hit

Joyce on the bridge of her nose. The man was yelling at Joyce, calling her names. The two struggled and then the man became upset and told Joyce he was going to kill her. He pulled the gun up and shot at Joyce twice. Joyce reached for the passenger door handle. She felt pressure on her chest near her right shoulder. Joyce was able to open the door and escape from the pickup. The man jumped towards his door. Joyce yelled at Morgan to get out of the pickup. Morgan barely was able to get out of the pickup before it jolted forward. Joyce and Morgan started running. The pickup left the scene.

Joyce ran to a residence and yelled for help. She felt wet and knew she had been shot. She had surgery to stop the bleeding. The surgery successfully stopped the bleeding in her chest, but she had many small cuts on her head that did not stop bleeding for days.

Joyce had never seen the man before, and he did not say his name. Joyce stated the man was wearing jeans and a white, short sleeve, collarless shirt with buttons on the front that went part way down. He was not wearing gloves. His face was red, as if it were sunburned, his hairline slightly higher, and he was taller than Joyce's five-foot three-inch height. He was not "extremely tall," and appeared to be in his 30's or 40's. He was clean shaven. She did not smell an odor of alcohol on the man's breath.

At trial Joyce identified Soojian as the man who attacked her. She testified at trial that the attacker was stockier than Soojian appeared at trial, and he had hair that was a lighter shade than Soojian's. Soojian was younger than the age range described by Joyce. Soojian had a goatee. Joyce testified that exhibit 46, a photograph of the interior of Soojian's pickup, did not look like the pickup the man drove because there was an armrest and center console in the picture.

Shortly after the incident, Joyce described the man as a White male with short reddish-colored hair, 35 to 40 years of age, stocky, and approximately five feet four inches tall. Joyce never recovered her wallet or any of its contents.

Shortly after Joyce's surgery, Detective Patrick Oh and some other officers showed Joyce some pictures and asked her if she could identify the perpetrator. Joyce pointed to someone and the officers left. Joyce said that she pointed to one photograph that looked like the perpetrator. She recognized the hairline, nose, and other facial characteristics. "[T]here was [sic] other faces and that was the one I picked." Joyce identified Soojian's vehicle as the pickup the perpetrator drove on the day of the shooting.

Morgan was 19 at the time of trial and 16 on the day of the shooting. Morgan noticed a white pickup, which appeared to be a GMC, swerving in front of him and his mother as they were delivering the newspapers. The pickup pulled to the side of the road. Joyce drove past the pickup. The pickup drove past Morgan and Joyce while they were delivering a newspaper to a ranch. The pickup then stopped and backed up. A man in the pickup asked Joyce if she knew how to drive to Clovis. The man got out of his pickup to show Joyce an address. When Morgan, who had been leaning out of the vehicle to deliver the paper, looked back, the man was pointing a gun at Joyce's head. The man stated he was going to rob Joyce and Morgan. Joyce told Morgan to get her wallet out of the glove compartment and she handed it to the man.

The man then told Joyce to get out of the vehicle with her arms raised and instructed her not to look at him. Morgan looked at the man only slightly because of the gun. Joyce and the man walked to the passenger side of Joyce's pickup where the man ordered Morgan to get out of the vehicle. Morgan stared at the man, who screamed at Morgan to stop looking at him. The man ordered Morgan to get into the bed of the pickup, facedown. All four tires were on the pavement.

Morgan then heard the man order Joyce to get into the cab of the pickup. The pickup started to move and then both Joyce and the man began screaming. The pickup began moving and stopping erratically. Morgan heard the man say "now you get shot," and then heard two gunshots. Joyce jumped out of the pickup and yelled at Morgan also to jump. Joyce and Morgan ran away. The man stopped and got out of his pickup. He pointed his gun at Morgan and Joyce but then got into the pickup and left without firing another shot. Joyce and Morgan ran towards a house. Joyce hopped over a fence and ran to the house. Morgan ran back to Joyce's pickup to get the cell phone. He called 911 to obtain assistance.

Morgan found two seeds in his hair while emergency personnel were attending to Joyce. A deputy sheriff took the seeds as evidence. Morgan noticed the same seeds in the bed of the man's pickup. Morgan described the pickup as a double cab, four doors, sounded like a diesel engine, and had large tires and wheels. Morgan recalled there was something like a horse bridle and a toolbox in the back of the man's pickup.

Morgan identified exhibit 41, a photograph of Soojian's pickup, as the perpetrator's pickup and identified a picture of the bridle found in the back of Soojian's pickup as the bridle in the perpetrator's pickup. He also identified a yellow substance as being inside the man's pickup bed from exhibit 44. Morgan testified that the toolbox in the pickup did not extend all the way across the truck bed.

Morgan spoke with Oh at the hospital. Oh showed him some photographs and Morgan identified the man. After reviewing Oh's police report, Morgan stated he could not identify the man in the pictures he was shown by Oh. Morgan did not identify Soojian at trial as the perpetrator.

Larry Crawford lived close to the location of the incident. He recalled hearing a woman screaming, a gunshot, and then silence. Next, he heard a commotion, like someone getting in and out of a vehicle, and then the sound of a vehicle taking off quickly. As the vehicle departed the scene, Crawford heard a noise that sounded as if the vehicle had a construction rack. Crawford was working in construction at the time and he heard that sound every day.

On April 18, 2004, at 3:54 a.m., Austin Herion, a deputy sheriff with the Fresno County Sheriff's Department, was dispatched to an area near the intersection of Shaw Avenue and DeWolf Avenue in Fresno County. At the scene, Herion met Morgan, who told him his mother had been shot. Morgan told Herion where his mother was located. Herion found her lying in a pool of blood. Joyce was not able to speak, but she indicated she was okay. An ambulance arrived and the attendants began caring for Joyce.

Herion obtained a statement from Morgan, who appeared to be unharmed. Morgan could describe the perpetrator only as a White male. Morgan provided a description of the perpetrator's vehicle as a white two-door Ford or Chevy pickup with two occupants. When Herion talked to Morgan a second time, he stated the vehicle was a four-door pickup. Morgan also told Herion that Joyce's credit cards should be in the vehicle. Joyce later stated it was a four-door pickup. In his radio transmissions, Herion stated that Joyce was shot in the suspect's vehicle, so there should be a significant amount of blood in the vehicle.

Herion next assisted other deputies in searching the area. Herion located a written estimate with an address on it. The estimate was from a company called Tri R. Ceramics and listed a customer name, address, and phone number. The customer listed on the estimate testified that Soojian had given her the estimate approximately one to two weeks before she was contacted by the police. The estimate was dated April 13, 2004, five days before the shooting.

On April 18, 2004, at 7:13 a.m., another officer issued a bulletin asking other units to be on the lookout for a full-size, four-door pickup with a solid rear window. The suspect was described as a White male in his mid-40's, short, medium build, with thinning brown hair. The weapon was described as a silver handgun, caliber unknown.

Deputy Sheriff Michael Clark responded to the scene and then to the hospital to speak with Joyce. He spoke with Joyce before she went into surgery. Considering her injuries, she had a very good demeanor. Joyce described the perpetrator as a White male adult, aged 38 to 45, five feet four inches tall, with a heavy build. He was "clean-cut" and was wearing a white T-shirt. The reference in the report to the suspect being "clean-shaven" was erroneous.

At the scene, shoe tracks were observed and documented along the left rear portion of Joyce's pickup. The shoe tracks were compared to the sandals recovered from under Soojian's residence. There were no individual characteristics, but the comparison suggested that the shoes could have left the tracks found at the scene.

An empty cigarette pack also was found at the scene. No fingerprints were recovered from it. The driver's door of Joyce's pickup also was processed for fingerprints. A small partial palm print was recovered from the driver's doorjamb. The palm print was consistent with someone opening the door with his or her left hand. The palm print later was compared to Soojian's palm print. It was determined that Soojian did not leave the palm print on Joyce's vehicle. The palm print was not run through any automated databases.

Deputy Sheriff Mark Chapman was at Soojian's residence, a mobilehome, when a search warrant was obtained. He inspected Soojian's vehicle, which he described as a white four-door GMC diesel pickup. The pickup was unlocked, with the keys in the ignition. The front seat center console was in the "down" position. The console folded up to make a front bench seat. On the front passenger seat was a small metal box in which forms could be stored and on which one could write. Recovered from the interior, among other items, was a checkbook and a paycheck stub that indicated Soojian had been paid gross wages of $600 for the preceding week. There also was a coffee cup located on the center floorboard in front of the center console. A torn piece of paper was recovered from the pocket in the driver's side door of the pickup.

In the bed of the pickup was a yellow tow strap, two horse halters, two ropes, a bag of grout, a toilet seat still in the box, chipped grout strewn across the bed, and some vegetation. On the outside of the pickup, Chapman noticed

an area along the passenger side just to the rear of the rear wheel that appeared to have been wiped recently. There was an area on the passenger side just above the rear tire that appeared to Chapman to be an impression left by some type of cloth. Before the pickup was towed, the inside of the pickup bed was vacuumed by a technician for a more thorough inspection.

Tire impressions were taken from the pickup. The tire tracks at the scene that were located just behind Joyce's pickup were not from Soojian's pickup. Samples of possible bloodstains were taken from above the stereo in the dash area, from the steering wheel, and from the front passenger side door. There were no cigarettes, nor were there any cigarette butts in the pickup. No pellets were found in the pickup. There was nothing located in Soojian's pickup that belonged to Joyce or Morgan. Nor was Joyce's wallet or its contents recovered from the scene. Hair found in the bed of Soojian's pickup did not belong to Morgan. Nor were there any seeds in the bed of the pickup that matched the seeds found in Morgan's hair.

The search of the outside of Soojian's residence located a pair of black pants that were rolled around a pair of sandals. These items were located behind the skirt surrounding the mobilehome. The pants were a size 36-inch waist and 34-inch inseam. The sandals were size 11. Inside the house detectives located some .22-caliber rifle ammunition with small pellets inside. A cartridge was disassembled and the pellets weighed 53.8 grains. The cartridges would not fit into a standard .22-caliber magnum revolver or semiautomatic handgun. There is one semiautomatic revolver called an Auto Mag that would fire the cartridges. They recovered a shirt, which had a stain that might have been blood. There were several rifles found at the residence, but no one determined whether any of the rifles would fire the ammunition recovered from the inside of the residence.

When Soojian was arrested, he was wearing size extra-large underwear (size 42 to 44) and size extra-large shorts. Size 10 shoes were recovered from the residence. Blue jeans seized at the residence were a size 38-inch waist and 32-inch inseam.

The written estimate recovered from the scene was determined to match the torn piece of paper found in Soojian's pickup.

DNA testing yielded the following relevant results: (1) The scrapings from Soojian's fingernails contained only Soojian's[4] DNA; (2) the bloodstain on

---

[4] Statistically, the profile from the fingernail scrapings would occur once in every 782 quadrillion unrelated individuals.

the written estimate recovered at the scene contained only Joyce's[5] DNA; (3) the bloodstain on the steering wheel of Soojian's pickup contained DNA from both Soojian and Joyce and one in every 11 million individuals in the general population; and (4) one stain on the black pants contained DNA that was consistent with Joyce's[6] DNA. The statistical probabilities would be much less if related individuals were considered. If a related individual were tested, one would expect the two to have many of the same values at specific markers. It would be expected that Soojian's DNA would be on the steering wheel of his pickup since he used it regularly.

Analyses of the samples taken from Soojian indicated there was no gunshot residue on either his right or left hand.

At trial, the testimony produced two facts that appeared to surprise both the prosecution and the defense. Morgan testified that the perpetrator's pickup had an attached metal toolbox in the bed of the pickup. Crawford, the neighbor who heard the perpetrator's pickup when it fled the scene, testified that he recognized the rattling sound made by the pickup as it left the scene as the sound of a construction rack attached to the bed of the pickup. Soojian's pickup did not have a toolbox or a construction rack.

As a result of this testimony, Soojian introduced pictures of a pickup owned by Bolin. The pictures showed the pickup towing a horse trailer and having a construction rack and toolbox attached to the bed of the pickup. Soojian's counsel also requested that Oh attempt to determine through the Department of Motor Vehicles (DMV) whether Bolin owned the pickup in 2004, but a DMV search required a license plate number for the vehicle, which Oh did not have.

Oh described Bolin as approximately five feet 10 inches tall and weighing 230 pounds, a size similar to Soojian. Soojian's father testified that Bolin was a few inches shorter than Soojian. Soojian also elicited testimony from Angela Butler, the DNA expert, that the statistical analysis on which the probabilities were based assumed that the relevant individuals were not related. If there were two related individuals who were possible donors of the DNA, then the statistical probabilities would decrease dramatically.

Soojian used this evidence and other inconsistencies in Joyce's and Morgan's testimonies to argue that the real perpetrator was Bolin. Soojian's counsel emphasized the following arguments: (1) Morgan, who claimed to have a good view of the perpetrator, did not identify Soojian as the

---

[5] The statistical probability was one in every 303 quadrillion unrelated individuals.

[6] The statistical probability was one in every 303 quadrillion unrelated individuals.

perpetrator; (2) the palm print left on the door of Joyce's pickup, presumably by the perpetrator, was not left by Soojian; (3) the palm print was never run through the Fresno County automated palm print system; (4) Joyce, who identified Soojian, was subjected to tremendous trauma and was medicated when she picked Soojian out of a photo lineup; (5) the tire tracks found at the scene, and presumably left by the perpetrator's vehicle, were not left by Soojian's pickup; (6) the initial radio broadcast identified the perpetrator's vehicle as a two-door pickup; (7) Bolin lived within 300 yards of Soojian at the time of the crime; (8) Joyce described the perpetrator as clean shaven, while Soojian had a full goatee at the time of the crime; (9) Bolin and Soojian appeared similar in the areas of the face Joyce focused on when picking Soojian's picture out of the photo lineup; (10) Joyce initially described the perpetrator as being five feet four inches tall, while Soojian was five feet 10 inches tall; (11) Bolin was shorter than Soojian; (12) Bolin did not have a goatee; (13) Soojian was with his six-year-old son on the day of the crime; (14) there was no gunshot residue on Soojian's hands when he was arrested; (15) Joyce's DNA was not present under Soojian's fingernails; (16) Bolin was present at his residence when the officers arrested Soojian, but his truck was not present; (17) there were no cuts or bruises on Soojian when he was arrested, as would be expected based on Joyce's testimony; (18) Soojian had no motive to rob Joyce; (19) the wallet taken from Joyce never was recovered; (20) Morgan did not identify several items that were found inside the bed of Soojian's pickup when he was arrested (tile mortar, toilet seat); (21) there were no pellets found inside Soojian's pickup; (22) the seeds in Morgan's hair did not come from the bed of Soojian's pickup; (23) none of Morgan's hairs were found inside the bed of Soojian's pickup; (24) the clothes recovered from underneath Soojian's mobilehome were a different size than worn by Soojian; (25) only a single drop of Joyce's blood was found inside the cab of Soojian's pickup, where one would expect significantly more blood to have splattered based on Joyce's injuries; (26) Joyce stated the inside of the pickup smelled like cigarettes, yet Soojian's pickup did not have that odor; and (27) the keys were in the ignition of Soojian's pickup when he was arrested, giving Bolin easy access.

## II. *The Information and the Verdict*

Soojian was charged by information with two counts of kidnapping to commit another crime (Joyce and Morgan) (§ 209, subd. (b)(1)), attempted murder (Joyce) (§§ 187, 664), two counts of assault with a deadly weapon (Joyce and Morgan) (§ 245, subd. (a)), and second degree robbery (§ 211).[7]

---

[7] Soojian also was accused of kidnapping for the purposes of committing a rape and sexual assault arising from a separate incident involving a separate victim. The jury found he was not guilty of these crimes. Accordingly, we have not included in our review the evidence related to these counts.

In addition, the information charged Soojian with personally discharging a firearm, causing great bodily injury within the meaning of section 12022.53, subdivision (d), personally inflicting great bodily injury within the meaning of section 12022.7, subdivision (a), and personal use of a firearm within the meaning of section 12022.5, subdivision (a) in the counts in which Joyce was a victim, and personally using a firearm within the meaning of section 12022.53, subdivision (b) and personal use of a firearm within the meaning of section 12022.5, subdivision (a) in the counts in which Morgan was the victim.

The jury found Soojian guilty of all counts and found all enhancements true.

## III. *Posttrial Proceedings*

### A. *The First Motion for a New Trial*

Soojian's defense team did not stop its efforts at the end of trial. Soojian's investigator, Scott I. Ross, attempted to contact Bolin to obtain the license number for the pickup pictured in the trial evidence, information the DMV stated it needed to determine the ownership history of a specific vehicle. Bolin did not return Ross's phone calls. Ross contacted numerous family members in his search. He eventually learned that the vehicle had been owned by another family member, Travis Hulsey. Hulsey's father located the front license plate of the vehicle in his garage, where it had been stored after an accident. Using this vehicle license number, Ross contacted the DMV and obtained the ownership history of the vehicle. The DMV confirmed that Bolin owned the vehicle on April 18, 2004, the date of the crime. Ross also obtained the name of the current owner and arranged to purchase the vehicle. The vehicle, a 1989 light-colored, two-door Ford pickup, with a gasoline engine, was then transported to a storage facility.

The vehicle was then examined by Technical Associates, Inc. (TA). TA was not able to recover any DNA from the vehicle. However, a California driver's license belonging to Joyce Marie Ahumada, with an expiration date of July 24, 2005, was lodged near the base of the passenger's seatbelt. Also recovered from the interior of the vehicle were 22 pellets from various locations on the passenger side of the interior of the vehicle. The weight of 15 of these pellets was determined to be 0.1411 grams. TA also obtained and weighed 15 pellets from a "snake shot" cartridge and determined those pellets weighed 0.1483 grams.[8]

Soojian also obtained a declaration from Peter Delgadillo, an employee of the Soojian family tile business since approximately 2002. Before joining the

---

[8] The pellets were selected randomly.

tile business, Delgadillo had worked in a gun shop, thereby becoming familiar with weapons and ammunition.

When Delgadillo joined the tile business, he initially worked with Bolin. Delgadillo confirmed that Bolin owned a two-door tan Ford pickup with a toolbox across the back of the bed below the rear window, two toolboxes along each bed rail, and a lumber rack above the bed. Delgadillo and Bolin worked together on a daily basis, and a friendship formed. On one occasion Delgadillo and Bolin rode in Delgadillo's pickup to go shooting on the Soojian ranch. The next morning, Delgadillo discovered that Bolin had left a revolver in his (Delgadillo's) pickup. Before Delgadillo returned the weapon, he removed the cartridges. Every other cartridge had a colored plastic cap with numerous small pellets inside the plastic cap. When Delgadillo inquired about the cartridges, Bolin described them as "snake shot."

With this evidence in hand, Soojian moved for a new trial based on newly discovered evidence. (§ 1181, subd. 8.) In his reply to the People's opposition, Soojian submitted the declaration of one of the jurors in the case in which she stated that had this new evidence been submitted at trial, she would not have voted to convict Soojian. The trial court denied the motion and we reversed the order and remanded for reconsideration applying the correct standard.

### B. *The Second Motion for a New Trial*

After the remittitur was issued in this case, Soojian again moved for a new trial. In addition to the evidence presented in the first motion for a new trial, Soojian presented several additional pieces of evidence. He argued that all of the evidence submitted established not only a reasonable probability of a different result in a new trial but also that Bolin was the perpetrator.

#### i. *Declaration of Tom McAleese*

Tom McAleese is an uncle of both Soojian and Bolin. He stated in his declaration that in approximately 2002 he had sold eight guns to Bolin, including three handguns. Two of the handguns were .22-caliber and one had a long barrel. A photo of the eight guns was attached to his declaration. He further stated he had not seen the guns since they were sold to Bolin, nor had Bolin ever returned any of the guns to him.

#### ii. *Declaration of Gayle McAleese*

Gayle McAleese is married to Tom McAleese and has at least two sisters. One sister is Soojian's mother and another sister is Bolin's mother, making

Gayle McAleese an aunt of both Soojian and Bolin. Gayle McAleese confirmed that eight guns had been sold to Bolin and stated that she had not seen the guns since they were transferred to Bolin. She also confirmed that Bolin had not returned any of the guns.

Approximately one month before Soojian's trial commenced, Gayle McAleese received a phone call from Bolin. During the conversation, Bolin asked Gayle McAleese what he should do with the guns. Gayle McAleese told Bolin she did not know what he was talking about. Bolin then stated that he did not think he should keep the guns, and he "thought he would 'get rid of them in the mountains' or something like that."

On October 14, 2008, approximately one year after Soojian's trial, Gayle McAleese received another phone call from Bolin. Bolin stated he had spoken with an investigator working for Soojian. Bolin told the investigator that he had borrowed the .22-caliber handgun from Tom McAleese and later had returned it to him. Bolin asked Gayle McAleese to tell the investigator that Bolin had returned the handgun to Tom McAleese and that Tom McAleese later had sold it. Bolin stated later in this conversation that Gayle McAleese should "do what [she had] to do."

### iii. *Declaration of Peter Delgadillo*

Delgadillo worked for Tri Tile Ceramics during the period 2002 to late 2007. He is familiar with guns and ammunition from his previous employment in a gun shop. He explained that he worked closely with Bolin and the two became friends. The two went hunting and shooting together on the Soojian family ranch where Bolin lived. On one occasion, after spending time shooting with Bolin, Delgadillo discovered a revolver in his truck. Bolin eventually asked about the revolver and Delgadillo returned it to him. Before doing so, he unloaded the weapon and discovered every other chamber was loaded with snake shot cartridges.

Delgadillo was shown the photograph of the guns authenticated by the McAleeses. Delgadillo stated one of the handguns in the photo looked "just like the revolver that Mr. Bolin left in my truck which was loaded with 'snakeshot.' "

### iv. *Declaration of Christina Ruelas*

Ruelas was employed at Tri Tile Ceramics as a showroom manager and project manager between 1997 and 2004. Her duties included scheduling estimates and installation and data entry. Her duties caused her to become familiar with the day-to-day tasks performed by various employees.

In 2004 Soojian and Bolin also worked at Tri Tile Ceramics. Soojian was the field supervisor and estimator. His responsibilities included providing an initial estimate of the work to be performed and supervising installation.

Bolin was an installer and occasionally worked in sales. His responsibilities included demolition, sheet rock installation, plumbing, electrical, and natural gas line installation.

When bidding on a project, Soojian would visit the potential customer's home and give an initial estimate. Soojian would fill out an estimate or work order form and determine if the project required demolition, sheet rock, plumbing, electrical, or natural gas line installation. If the project required more than tile installation, Soojian would give the original estimate form to Bolin. Bolin then would visit the jobsite and provide an estimate for the additional work (demolition, sheet rock, plumbing, electrical, or natural gas). Bolin would add his estimate to that provided by Soojian and then return the form to the office where Ruelas would enter the information into the computer system.

Ruelas reviewed the work order form found at the scene of the crime. On the back of the work order form were three diagrams, one referring to a "cook top" and the other two referring to a "sink." The sink installation would have required a plumbing connection and the cooktop would have required an electrical connection. Accordingly, Soojian would have given the estimate to Bolin so he could inspect the proposed job and provide an estimate for the additional work. "This is exactly the type of order . . . which would have started with [Soojian], but gone to . . . Bolin for completion."

### v. *Declaration of Paul Herrmann*

Herrmann is a board certified forensic pathologist. He reviewed the relevant trial testimony. Herrmann opined that the gunshot wound to the chest suffered by Joyce may not have resulted in blood being deposited inside the perpetrator's vehicle because the clothing Joyce was wearing may have absorbed the blood until Joyce escaped from the vehicle. Accordingly, this evidence did not eliminate the possibility that Joyce was shot in Soojian's pickup.

The face and head wounds suffered by Joyce, however, would have resulted in a significant amount of blood being deposited inside the perpetrator's vehicle. Head wounds bleed fast and easily. Joyce testified, and pictures confirmed, that there was a significant amount of blood in Joyce's hair. Thus, "the presence of a single spot of blood inside . . . Soojian's truck is not consistent with [Joyce's] head wounds having occurred there. I would expect to see a great deal more blood in the truck where these injuries occurred."

vi. *Declaration of Terri L. Haddix*

Haddix is a board certified forensic pathologist who also reviewed the relevant testimony. Haddix agreed with Herrmann that the gunshot wound to the chest would have bled, but Joyce's clothing could have absorbed all of the blood while she remained in the vehicle. Haddix also agreed that the face and scalp wounds would have produced more blood than the minute amounts found in Soojian's vehicle. Haddix added that the "degree of blood shed from these facial and scalp wounds could easily account for the blood found on the paper receipt for which there is no corresponding collection of blood in [Soojian's] vehicle."

vii. *Declaration of Kenneth R. Moses*

Moses is an expert in forensics, including crime scene reconstruction and blood spatter analysis. Moses examined the Tri Tile Ceramics work order found at the scene that contained Joyce's blood. He opined that the blood on the front of the work order was consistent with moving contact with a bloody object similar to clothing or cloth. The back side of the work order contained two "defined pattern transfers." The first pattern was caused by a blood-covered object striking the work order "with sufficient force and contained sufficient wet blood to cause a splashing pattern to emanate outward." The second pattern was from an object with a "well-defined rectangular edge possibly from the edge of a second piece of paper that would also have been bloody."

Moses opined that the paper must have been stained while in the vehicle because it did not contain any details or imperfections from the road. Because there was blood on both sides of the work order, and because of the amount of blood required to create the first pattern on the work order, Moses concluded that there should have been a significant amount of blood shed inside the perpetrator's vehicle. The small amount of blood recovered from Soojian's vehicle was inconsistent with what Moses would expect to find in the perpetrator's vehicle.

viii. *Declaration of Michael Gaynor*

Gaynor is an expert in forensics, including crime scene investigation and bloodstain pattern identification. He examined the Tri Tile Ceramics work order found at the scene of the crime. On the front of the work order he observed blood drops, swipe patterns, and contact transfer patterns. The drops were the result of blood dropping on the work order from a source above the form. The swipe pattern and the transfer pattern occurred when a bloody object came in contact with the work order.

The blood patterns on the back of the work order consisted of pattern transfers, blood drops, and blood drops showing directionality, indicating force was used to create them. The two larger pattern transfers were created by a bloody object that came in contact with the work order. The patterns met the edge of the work order, indicating that blood was transferred onto whatever object was next to the work order at the time of contact (such as floor, seat, another object, etc.).

Gaynor opined that the work order was not on the street when the blood was deposited on it. The amount of blood on the work order, as well as there being blood all the way to the edge of the work order, indicated there probably was a significant amount of blood in the perpetrator's vehicle. The small amount of blood found in Soojian's vehicle was inconsistent with what Gaynor would expect to find in the perpetrator's vehicle.

### ix. *Declaration of Scott C. Fraser*

Fraser is a neurophysiologist with an expertise in perception, memory, recall, recognition, night vision, brain functions, and psychopharmacology. Fraser reviewed the relevant portions of the transcript and noted the following: At the hospital, Joyce took a " 'quick look' " at a photographic lineup and stated that the photo of Soojian looked "just like him." At trial Joyce again was shown the photographic lineup and identified the picture of Soojian as that of the perpetrator. When again shown the photographic lineup, Joyce testified that Soojian was not the perpetrator because the perpetrator did not have a goatee. When questioned about the appearance of the perpetrator, Joyce testified that he did not have a goatee. Later in her testimony, Joyce stated she did not believe the perpetrator had a goatee, but she was not sure. Soojian had a "distinct and full grown goatee and mustache" on the day of the assault.

Morgan testified that he looked at the perpetrator several times during the incident and told detectives he got "a 'good look' " at the perpetrator. Morgan, however, could not identify Soojian as the perpetrator.

Based on this testimony, Fraser indicated that he could testify to the following facts and opinions: At the time of the assault, there was no moon visible. The only illumination at the scene, therefore, was from artificial sources. There were no street lights or building lights near the crime location. Thus, the only illumination in the roadway was from the headlights of the perpetrator's vehicle and Joyce's vehicle. There would be minimal lighting in the area between the two vehicles because headlights shine forward and to the right. "A person's ability to detect colors, edges, and feature boundaries

clearly would be compromised and severely reduced under such low illumination lighting conditions. This lack of illumination would affect the reliability of any identification because of the reduction on depth of field . . . , the loss of reliable color detection, and the inability to perceive feature details of objects such as a face."

Joyce also testified that it was dark inside the perpetrator's vehicle, the only illumination coming from the dashboard lighting. Because of her position in the pickup, Joyce could see only the perpetrator with her peripheral vision. Studies indicate that "under such observation conditions subsequent recognition of a person seen would be very unreliable."

Fraser also noted that the perpetrator used a gun during the crime, both striking and shooting Joyce. "The presence of a weapon diminishes the reliability of eyewitness identification. This is because, as the empirical research over decades has shown, the weapon is a distractor that commands the attention of the victim and reduces the amount of attentional face focus during the exposure period." In addition, the body's reaction to the stress caused by a weapon results in reduced flow of blood to the brain cortex, reducing "the working capacity of the brain to process and store visual information." Over 100 years of research has established that there is a significant reduction in person recognition accuracy based on observations under high stress or high fear conditions.

Joyce's testimony that the perpetrator did not have a goatee, or she believed he did not have one, also cast doubt on her identification. "A goatee is considered [a] distinctive cue which is any feature of the person observed that is unique, unusual, abnormal, or odd and distinguishes the person observed from similar others. As the scientific studies have shown, distinctive cues are the most accurate part of the perception of others." A witness describing a perpetrator rarely omits mention of an oddity, such as a goatee. The error rate "is exceedingly low ranging between once in 500 and once in 1,000 times." When a person describes a perpetrator as not having a distinctive cue, and then identifies in a photographic lineup a person with the distinctive cue, studies have shown that the identification choice likely is incorrect. Fraser opined that based on this information, Joyce probably was correct when she stated that the perpetrator *did not* have a goatee.

Finally, studies have shown that Morgan's failure to identify Soojian as the perpetrator is just as likely to be correct as Joyce's identification of Soojian.

### x. *Declaration of Second Juror*

A second juror in the case was contacted. She stated that she recalled the case, and that an investigator for Soojian informed her of the above witnesses

and their proposed testimonies. She stated that if this testimony had been presented at trial, she would not have voted to convict Soojian.

### C. The People's Opposition

The People initially filed a supplemental opposition shortly after the remittitur was filed in the case. This document was filed before Soojian filed any additional papers. The supplemental opposition emphasized the evidence linking Soojian to the crime and attempted to minimize the newly discovered evidence. This evidence consisted of Joyce's identification of Soojian as the perpetrator, her blood located on the inside and outside of Soojian's vehicle, the jeans that contained Joyce's blood located under Soojian's mobilehome, and the portion of the work order found in Soojian's vehicle that matched the work order found at the scene of the assault. The People argued the new evidence would not have led to a different result because this evidence overwhelmingly established Soojian's guilt.

### D. The Trial Court's Ruling

The trial court reiterated the requirements it is to consider when ruling on a motion for a new trial based on newly discovered evidence. It concluded the majority of the evidence offered after remand could have been presented at the first trial and thus was not newly discovered within the meaning of the statute. Next, the trial court analyzed whether the remainder of the newly discovered evidence, if presented at trial, would have probably led to a different result. While the trial court was "confident that the new evidence raises the possibility of a different result at trial," it concluded a different result was not probable. Therefore, the motion for a new trial was denied.

### DISCUSSION

The authority to grant a defendant a new trial is found in section 1181. Soojian moved for a new trial citing subdivision 8 of section 1181, which states that a defendant should have a new trial: "When new evidence is discovered material to the defendant, and which he could not, with reasonable diligence, have discovered and produced at the trial. When a motion for a new trial is made upon the ground of newly discovered evidence, the defendant must produce at the hearing, in support thereof, the affidavits of the witnesses by whom such evidence is expected to be given, and if time is required by the defendant to procure such affidavits, the court may postpone the hearing of the motion for such length of time as, under all circumstances of the case, may seem reasonable."

The factors to be considered by the trial court when ruling on a motion for a new trial based on newly discovered evidence were first set out in *People v.*

*Sutton* (1887) 73 Cal. 243 [15 P. 86] (*Sutton*). "To entitle a party to a new trial on the ground of newly discovered evidence, it must appear,—'1. That the evidence, and not merely its materiality, be newly discovered; 2. That the evidence be not cumulative merely; 3. That it be such as to render a different result probable on a retrial of the cause; 4. That the party could not with reasonable diligence have discovered and produced it at the trial; and 5. That these facts be shown by the best evidence of which the case admits.' [Citation.]" (*Id.* at pp. 247–248.) These standards have been reiterated on numerous occasions. (*People v. Turner* (1994) 8 Cal.4th 137, 212 [32 Cal.Rptr.2d 762, 878 P.2d 521], overruled on other grounds in *People v. Griffin* (2004) 33 Cal.4th 536, 555, fn. 5 [15 Cal.Rptr.3d 743, 93 P.3d 344]; *People v. Delgado* (1993) 5 Cal.4th 312, 328 [19 Cal.Rptr.2d 529, 851 P.2d 811] (*Delgado*); *People v. Martinez* (1984) 36 Cal.3d 816, 821 [205 Cal.Rptr. 852, 685 P.2d 1203] (*Martinez*).)

The standard of review we must apply also was established in *Sutton*. " 'Applications on this ground are addressed to the discretion of the court below, and the action of the court below will not be disturbed except for an abuse of discretion . . . .' " (*Sutton, supra,* 73 Cal. at p. 248.) We must review each case on its own factual background and will not disturb the trial court's ruling unless " ' "a manifest and unmistakable abuse of discretion clearly appears." ' [Citations.]" (*Delgado, supra,* 5 Cal.4th at p. 328.)

I. *Consideration of the Additional Evidence*

There are three issues we must consider in resolving this matter. The first issue is the additional evidence submitted by Soojian in the second motion for a new trial. Generally, this evidence consisted of (1) expert testimony regarding the lack of blood found in Soojian's vehicle, (2) expert testimony asserting that Joyce's identification of Soojian was suspect, (3) testimony that Bolin owned handguns, including a handgun that fired snake shot, (4) testimony that Bolin stated he was going to dispose of his handguns and attempted to solicit others to lie about his gun ownership, and (5) testimony placing one of the key pieces of evidence, the bloodstained work order, in Bolin's possession at the time of the assault.

While the trial court agreed to consider the evidence, it found it was not newly discovered evidence within the meaning of section 1181. The trial court relied on the general rule that requires the defendant to establish that the new evidence could not have been discovered with reasonable diligence and produced at trial. The trial court concluded that Soojian, with reasonable diligence, could have discovered and produced this evidence at trial. (*Sutton, supra,* 73 Cal. at pp. 247–248.)

Soojian acknowledges the general rule, but argues an exception to this rule required the trial court, and requires this court, to consider this evidence. We agree with the trial court that the expert testimony proffered by Soojian could have been, and perhaps should have been, presented at trial. Each of these issues was known before trial, and Soojian had adequate time before trial to locate and retain experts on these topics.

We are not so certain that the evidence related to Bolin's ownership of handguns, and his subsequent attempts to distance himself from the guns, falls into this category. As stated earlier, it was only during trial that the possibility that Bolin was the perpetrator came to light. It was the testimony from Morgan about the toolbox in the bed of the pickup and the testimony of Crawford that he heard the sound of a construction rack when the pickup drove away that led to the suspicion that Bolin could be the perpetrator. This did not leave much time for Soojian to investigate other evidence that may have connected Bolin to the crime.

We need not rest our decision on this ground, however, because Soojian argues the exception to the general rule allowed the trial court to consider all of the evidence. This exception, if that is the correct term, arises from the Supreme Court's decision in *Martinez, supra*, 36 Cal.3d 816. Martinez was convicted of burglary related to the theft of various items of machinery from a tool company. The only evidence linking Martinez to the theft was his palm print lifted from a drill press that had been removed from the building but abandoned near the fence surrounding the building.

Martinez previously had worked at the tool company and, at the time of the theft, worked across the street from the tool company. He testified that he often was at the tool company either to visit friends, deliver or pick up items for his current employer, or to use the machines at the tool company to make or repair items for his employer. Martinez testified that on occasion he would touch or lean on the various machines at the tool company during his visits. In addition, Martinez testified about his whereabouts on the night of the burglary and presented several witnesses to confirm the alibi. This left a period of only four hours unaccounted for on the night of the burglary.

The prosecution, to establish that Martinez had not left the palm print innocently on another occasion, presented the testimony of a maintenance man who worked at the tool company. This witness came forward three weeks after the theft and informed investigators that he had cleaned and painted the drill press on the night of the theft. The prosecution argued, based on this testimony, that the only time Martinez could have left the palm print on the drill press was during the burglary.

After trial, trial counsel moved for a new trial on the basis of newly discovered evidence. The new evidence was the declaration of a former employee of the tool company. This employee specifically recalled that the drill press had been cleaned and painted at least a few days before the burglary, not on the day of the burglary. The trial court denied the motion, concluding that the new evidence did not render a different result probable at retrial, and that the new testimony could have been discovered before trial and presented at trial. (*Martinez, supra*, 36 Cal.3d at p. 822.)

The Supreme Court first rejected the trial court's conclusion that the new evidence did not render a different result probable at retrial. It noted that the only evidence tying Martinez to the burglary was his palm print on the drill press, and the only evidence to contradict the innocent explanation offered by Martinez was the testimony of the maintenance man. (*Martinez, supra*, 36 Cal.3d at pp. 822–823.) The Supreme Court concluded that the new testimony "reopen[ed] the critical gap in the prosecution's chain of proof. If the jurors even found a reasonable possibility that [the former employee's] testimony was true, it is unlikely that they would find defendant's guilt proved beyond a reasonable doubt." (*Id.* at p. 823.)

The Supreme Court also rejected the People's argument that the jury would probably believe the testimony of the maintenance man over that of the former employee. "The problem with this reasoning, like that of the trial court, is that it overlooks the burden of proof. To acquit defendant, the jury need not find [the former employee's] recollection accurate and [the maintenance man's] inaccurate. It need only decide that [the former employee's] testimony raised a reasonable doubt as to the time when the drill press was repainted, and thus a reasonable doubt as to defendant's guilt. In our opinion, it is sufficiently likely that the jury would so find that we cannot uphold the denial of defendant's motion on the theory that the evidence in question would not affect the outcome of the case." (*Martinez, supra*, 36 Cal.3d at pp. 823–824.)

The Supreme Court then turned to the question of whether the evidence could have been presented at trial. It concluded that on the record, "the trial court could reasonably find that counsel failed to use reasonable diligence in obtaining [the former employee's] testimony." (*Martinez, supra*, 36 Cal.3d at p. 825.) The Supreme Court, however, did not end its analysis with this conclusion.

"We do not believe, however, that this lack of diligence is a sufficient basis for denial of defendant's motion. The requirement of diligence serves 'a public policy which demands that a litigant exhaust every reasonable effort to produce at his trial all existing evidence in his own behalf, to the end that the

litigation may be concluded.' [Citations.] That policy, however, itself serves a more fundamental purpose—the determination of guilt and innocence. Loyal to that higher purpose, some California cases suggest that the standard of diligence may be relaxed when the newly discovered evidence would probably lead to a different result on retrial. [Citations.] On the other hand, we have found none which declare that although newly discovered evidence shows the defendant was probably innocent, he must remain convicted because counsel failed to use diligence to discover the evidence.

 "Once a trial court determines that a 'defendant did not have a "fair trial on the merits, and that by reason of the newly discovered evidence the result could reasonably and probably be different on a retrial," ' [citation], it should not seek to sustain an erroneous judgment imposing criminal penalties on the defendant as a way of punishing defense counsel's lack of diligence. In many cases, as defendant points out, proof of counsel's lack of diligence to discover evidence will demonstrate that counsel was constitutionally inadequate under the standards established in *People* v. *Pope* (1979) 23 Cal.3d 412, 425 [152 Cal.Rptr. 732, 590 P.2d 859] and *People* v. *Fosselman* (1983) 33 Cal.3d 572, 584 [189 Cal.Rptr. 855, 659 P.2d 1144]. In such cases a new trial would be required under article I, section 15 of the California Constitution. The focus of the trial court, however, should be on the significance and impact of the newly discovered evidence, not upon the failings of counsel or whether counsel's lack of diligence was so unjustifiable that it fell below constitutional standards. Counsel who believes in good faith that he used due diligence cannot reasonably be expected to argue his own ineffectiveness; his client should not pay a penalty because of the attorney's unwillingness to assert his own incompetence. If consideration of the newly discovered evidence is essential to a fair trial and a just verdict, the court should be able to grant a new trial without condemning trial counsel as constitutionally ineffective.

 "In conclusion, an enlightened system of criminal justice must recognize that, despite all the protections afforded a criminal defendant before and during trial, on rare occasions a person will be wrongfully convicted. [Citations.] Procedural rules designed to encourage the parties to discover and produce their evidence at the trial should not blind the system to the occasional miscarriage of justice. Fundamental principles of due process require a remedy by which a defendant can bring newly discovered evidence before a court to urge correction of an erroneous judgment. The motion for a new trial serves that purpose in California; it provides speedy review of his claims and, because it is a direct attack on the judgment, avoids the limitations of the writs of habeas corpus and *coram nobis*. A strict enforcement of the diligence requirement, however, would frustrate that remedy and, joined with the various limitations imposed on the reach of collateral writs,

would risk that an innocent defendant would not fall within the scope of any remedy." (*Martinez, supra,* 36 Cal.3d at pp. 825–826, fns. omitted.)

The Supreme Court concluded that the trial court abused its discretion in denying the motion for a new trial because the testimony of the former employee "would probably lead to a different result at retrial. Reliance upon counsel's lack of diligence to bar defendant from presenting that evidence to a trier of fact would work a manifest miscarriage of justice. [Citation.]" (*Martinez, supra,* 36 Cal.3d at pp. 826–827.)

Justice Grodin, in a separate concurring opinion, also concluded that Martinez was entitled to a new trial but disagreed with the majority's analysis. In his opinion, section 1181 precluded consideration of evidence that could have been presented at trial with reasonable diligence. Justice Grodin concluded, however, that the failure to interview and evaluate the former employee before trial was an oversight by trial counsel, for which there was no legitimate tactical reason. Accordingly, trial counsel was ineffective, entitling Martinez to a new trial. (*Martinez, supra,* 36 Cal.3d at pp. 828–829 (conc. opn. of Grodin, J.).)

*Martinez* is a very limited exception to the general diligence requirement found in section 1181. The Supreme Court emphasized the narrowness of the exception and distanced itself from *Martinez* in *People v. Dyer* (1988) 45 Cal.3d 26 [246 Cal.Rptr. 209, 753 P.2d 1] (*Dyer*). Dyer was convicted of two counts of first degree murder, two counts of attempted murder, and four counts of kidnapping, along with various enhancements. The jury and the trial court imposed the death penalty.

The conviction arose out of events that occurred during a night of drug abuse by Dyer, his associates, and several of the victims. At one point Dyer discovered that someone had stolen some of his jewelry and concluded one of the victims was responsible. Dyer and his associates decided that if one victim was to be killed, all four should be killed. The four were forced into an automobile, driven to a remote location, and shot. Two of the victims died and two survived.

Dyer admitted his involvement, but claimed that because of his drug use he could not recall the events of that night and could not recall if he had actually shot someone. But, if he had shot someone, he did so without deliberation and premeditation.

After trial Dyer moved for a new trial on the basis of newly discovered evidence. This evidence consisted of two witnesses who had seen Dyer a few hours before the murders with one of the victims. These witnesses would

testify that Dyer "was 'not himself' " and appeared to be under the influence of drugs when they saw him. (*Dyer, supra*, 45 Cal.3d at p. 50.) Defense counsel admitted the names of the witnesses were known to him before trial. The trial court denied the motion, concluding the witnesses could have been discovered had trial counsel used reasonable diligence. (*Id.* at p. 51.)

Dyer relied on *Martinez* to argue to the Supreme Court that the trial court abused its discretion in denying his motion for a new trial. The Supreme Court rejected the argument and distinguished *Martinez*.

"We stressed [in *Martinez*] that 'the determination of guilt and innocence' was the 'fundamental purpose' of trial, superseding the public policy to conclude litigation. [Citation.] Thus, '[t]he focus of the trial court . . . should be on the significance and impact of the newly discovered evidence, not upon the failings of counsel or whether counsel's lack of diligence was so unjustifiable that it fell below constitutional standards.' [Citation.] We therefore held that '[i]f consideration of the newly discovered evidence is essential to a fair trial and a just verdict, the court should be able to grant a new trial without condemning trial counsel as constitutionally ineffective.' [Citation.] Noting that the prosecution's case was *extremely* weak, we concluded: 'The defense in the case before us presented newly discovered evidence—the testimony of [a new witness]—which in our opinion would probably lead to a different result at retrial. *Reliance upon counsel's lack of diligence* to bar defendant from presenting that evidence to a trier of fact would work a manifest miscarriage of justice.' [Citation.] Accordingly, we reversed the trial court's ruling.

"At no time, however, did we indicate that a defendant is entitled to a new trial whenever evidence that was not presented at a previous trial is sought to be offered on retrial. The evidence generally *must* be newly discovered.

█ "Additionally this is not a case, like *Martinez* . . . in which the prosecution's case was extremely weak; to the contrary, defendant never denied that the events took place substantially as [the surviving victims] testified. Thus, even if the evidence somehow could be considered 'new,' defendant has failed to demonstrate that admission of the testimony of two witnesses that he appeared 'spaced out' hours before the murders would likely have led to a different result. 'The granting or denial of a motion for a new trial on the ground of newly discovered evidence is a matter within the sound discretion of the trial court, and in determining whether there has been a proper exercise of discretion on such motion, each case must be judged from its own factual background. [Citation.]' [Citation.] We conclude the trial court did not abuse its discretion in denying defendant's motion for new trial." (*Dyer, supra*, 45 Cal.3d at pp. 51–52.)

We note that the *Dyer* court appeared to focus on whether the new evidence would result in a reasonable probability of a different result on retrial. In other words, the *Martinez* analysis was inapplicable because the new evidence did not render it reasonably probable that Dyer would achieve a better result on retrial if the new evidence was considered. Other cases that have discussed the application of *Martinez* have focused on the weakness of the prosecution's case, whether the new evidence directly contradicted the prosecution's strongest evidence against the defendant, and the likelihood that reversal would have been required utilizing an ineffective assistance of counsel analysis. While we are not certain whether any of these factors must be present, we are certain that each case must stand on its own facts, and no bright line can be drawn to permit easy resolution of this issue.

We conclude the refusal to consider the new evidence in this case would result in a miscarriage of justice. As we shall explain in part III., this is one of the rare cases in which the defendant should not be penalized for trial counsel's lack of diligence.[9]

## II. *Standard Utilized by the Trial Court*

The second issue is the standard applied by the trial court in ruling on Soojian's motion. At the hearing, the trial court questioned both counsel about the standard it should apply when ruling on the motion. The parties agreed that Soojian was required to establish that the new evidence would render a different result probable at retrial. The trial court questioned counsel on the meaning of the phrase "a different result." Trial counsel stated that based on Justice Broussard's concurring and dissenting opinion in *People v. Brown* (1988) 46 Cal.3d 432, 471, footnote 1 [250 Cal.Rptr. 604, 758 P.2d 1135] (*Brown*), the trial court need conclude only that the new evidence would convince a single juror to change his or her vote, resulting in a hung jury. When the trial court asked the prosecutor the same question, he essentially conceded that a hung jury was a better result within the meaning of the statute.

In spite of the concurrence of the trial attorneys, the trial court concluded, based on its research, that Soojian was required to establish that the new evidence would have resulted in a different verdict, i.e., the new evidence made it reasonably probable that an objective jury would have found Soojian not guilty of the charged crimes. Trial counsel attempted to clarify how the trial court would have ruled if the standard required only one juror to change his or her vote. The trial court, however, stated that it would have to "revisit" the issue if it had misinterpreted the standard.

---

[9] We note that in this case the same result would be reached if we approached the issue as a claim of ineffective assistance of counsel. At argument on the motion for new trial, trial counsel admitted he was ineffective for failing to present this evidence.

Soojian argues the trial court's ruling was erroneous, and that he was entitled to a new trial if the new evidence made it reasonably probable that a single juror would have found him not guilty, thus causing a hung jury. The People essentially concede that the trial court erred but urge us to find the error harmless because of what the People view as overwhelming evidence proving Soojian's guilt.

Neither our research nor that of the parties has located any case directly on point. The trial court based its ruling on *Brown*, but our review of the case discloses nothing that could be interpreted as supporting the trial court's conclusion. The relevant portion of *Brown* addressed the proper standard of review to be applied when assessing the effect of a state law error during the penalty phase of a capital trial. The Supreme Court reiterated that in deciding whether such error was harmless, the court must decide if there was "a reasonable (i.e., realistic) possibility that the jury would have rendered a different [penalty] verdict had the error or errors not occurred." (*Brown, supra*, 46 Cal.3d at p. 448.) Neither the majority nor the concurring opinions of Justices Mosk and Kaufman addressed how the phrase "a different verdict" should be defined.

Without authority directly on point, we must turn to analogous authority to confirm that which the parties concede. As stated above, Soojian is entitled to a new trial if the new evidence renders a different result probable if a new trial is held. (*Sutton, supra*, 73 Cal. at pp. 247–248.) In *People v. Watson* (1956) 46 Cal.2d 818 [299 P.2d 243] (*Watson*), the Supreme Court established the test for determining whether an error in the trial court resulted in a miscarriage of justice permitting a reversal of the judgment as required by the California Constitution, article VI, section 13. The Supreme Court concluded that a miscarriage of justice occurred when "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*Watson*, at p. 836.)

The Supreme Court has emphasized "that a 'probability' in this context does not mean more likely than not, but merely a *reasonable chance*, more than an *abstract possibility*. ([*Watson, supra*, 46 Cal.2d] at p. 837; cf. *Strickland* v. *Washington* (1984) 466 U.S. 668, 693–694, 697, 698 [80 L.Ed.2d 674, 104 S.Ct. 2052] ['reasonable probability' does not mean 'more likely than not,' but merely 'probability sufficient to undermine confidence in the outcome'].)" (*College Hospital Inc. v. Superior Court* (1994) 8 Cal.4th 704, 715 [34 Cal.Rptr.2d 898, 882 P.2d 894].)

We can discern no significant distinction between the phrases "a different result" and "a result more favorable." Both standards anticipate that the party seeking relief will be in a different, and necessarily a better, position if relief

is granted. Both phrases establish a standard the party seeking relief must overcome to have the result in the trial reversed. And it is undeniable that a more favorable result also will be a different result.

It appears that under the *Watson* standard a hung jury is considered a more favorable result than a guilty verdict. In our research we have located only one California appellate case that so holds, *People v. Bowers* (2001) 87 Cal.App.4th 722, 736 [104 Cal.Rptr.2d 726]. The only authority for this proposition cited by *Bowers*, however, was *Watson*, which does not specifically so hold. Instead, the *Bowers* court appears to assume, with justification, that a hung jury is a more favorable result than a guilty verdict. This is the same conclusion reached by Justice Broussard in his concurring and dissenting opinion in *Brown*. (*Brown, supra*, 46 Cal.3d at p. 471, fn. 1 (conc. & dis. opn. of Broussard, J.).) The only authority relied on by Justice Broussard was section 190.4, subdivision (d), which at the time gave the trial judge in a capital trial discretion to impose a sentence of life without the possibility of parole if the jury could not reach a penalty verdict. (See § 190.4, subd. (b).)

Several cases, however, have appeared to presume that a hung jury resulting in a mistrial is a better result than a guilty verdict. (See *Richardson v. Superior Court* (2008) 43 Cal.4th 1040, 1045 [77 Cal.Rptr.3d 226, 183 P.3d 1199]; *People v. Griffin* (1967) 66 Cal.2d 459, 466 [58 Cal.Rptr. 107, 426 P.2d 507]; *People v. Terry* (1964) 61 Cal.2d 137, 153 [37 Cal.Rptr. 605, 390 P.2d 381], overruled on other grounds in *People v. Laino* (2004) 32 Cal.4th 878, 893 [11 Cal.Rptr.3d 723, 87 P.3d 27]; *People v. Hamilton* (1963) 60 Cal.2d 105, 136–137 [32 Cal.Rptr. 4, 383 P.2d 412], overruled on other grounds in *People v. Morse* (1964) 60 Cal.2d 631, 648–649 [36 Cal.Rptr. 201, 388 P.2d 33].) Other cases have found it persuasive that the first trial ended in a hung jury when deciding whether the error that occurred in the retrial was prejudicial. (*People v. Kelley* (1967) 66 Cal.2d 232, 245 [57 Cal.Rptr. 363, 424 P.2d 947]; *People v. Linder* (1971) 5 Cal.3d 342, 347–348 [96 Cal.Rptr. 26, 486 P.2d 1226]; *People v. Taylor* (1986) 180 Cal.App.3d 622, 634 [225 Cal.Rptr. 733]; *People v. Sergill* (1982) 138 Cal.App.3d 34, 41 [187 Cal.Rptr. 497]; *People v. Thomas* (1981) 119 Cal.App.3d 960, 966 [174 Cal.Rptr. 107]; *People v. Brooks* (1979) 88 Cal.App.3d 180, 188 [151 Cal.Rptr. 606].) Federal cases also have proceeded on the presumption that prejudice occurred if the absence of error would change a single juror's mind. (See, e.g., *U.S. v. Price* (9th Cir. 2009) 566 F.3d 900, 911, and cases cited therein.)

The only opposition to this line of authority provided by the People is an attempt to distinguish each of the cases for various reasons. We agree each case is distinguishable, since no case has defined the term "different result" in the context of a motion for a new trial based on newly discovered evidence. These cases, however, are not cited because they are identical to the case

before us but because they add to the persuasiveness of the argument advanced by Soojian. The People make no reasoned argument why these cases should not support the proposition endorsed by Soojian.

■ In addition to persuasive authority, common sense compels the conclusion that a hung jury is a more favorable result than a guilty verdict. A defendant found guilty by a jury will be subject to sentencing, while a hung jury would result in, at most, a retrial of the case.

We presume the reason no case has addressed this precise issue is because the proposition is one that never has been challenged seriously. Moreover, if the analysis first set forth in *Sutton* was meant to require the defendant to prove that the newly discovered evidence would make a different verdict probable on retrial, we are confident the Supreme Court would have stated so clearly.

For all of these reasons we hold that when a defendant makes a motion for a new trial based on newly discovered evidence, he has met his burden of establishing that a different result is probable on retrial of the case if he has established that it is probable that at least one juror would have voted to find him not guilty had the new evidence been presented. While our holding is necessarily limited to the procedural stance in which we find this case, we are confident that our conclusion is equally applicable to any situation where the trial court is required to determine if an error that occurred at trial would result in a more favorable or different result in a retrial.

Since the trial court utilized an incorrect legal standard to deny Soojian's motion, it abused its discrètion and reversal of the trial court's order is required. (*Farris v. Fireman's Fund Ins. Co.* (2004) 119 Cal.App.4th 671, 689 [14 Cal.Rptr.3d 618].)

III. *Remedy on Remand*

The third issue is the remedy on remand. We have three options: (1) remand to permit the trial court to apply the correct definition of a "better result," (2) find the error did not cause Soojian any prejudice and affirm the judgment, or (3) order the trial court to grant Soojian's motion for a new trial.

The following factors enter into our analysis: First, the trial court clearly stated that its analysis was based on the definition of a "better result" that we have rejected. Second, the trial court clearly stated that if the definition it chose for a "better result" was incorrect, it would have to "revisit" the question of whether Soojian's motion should be granted. Therefore, our analysis cannot be guided by an indication from the trial court on how it

would rule had the correct standard been applied. Third, the assault occurred in 2004, and it appears Soojian has been in custody since his arrest the day of the crime (or shortly after that date).

We also are guided by the trial judge's disqualification from ruling on the motion. The transcript of the hearing on the motion refers to disqualification of the Honorable James L. Quashnick, who presided over the trial. The Honorable M. Bruce Smith ruled on the motion for the new trial. This factor is significant because the ability to gage the credibility of the witnesses when considering the new evidence is absent. (See, e.g., *People v. Shoals* (1992) 8 Cal.App.4th 475, 488 [10 Cal.Rptr.2d 296]; *People v. Hayes* (1985) 172 Cal.App.3d 517, 524–525 [218 Cal.Rptr. 362].)

The People argue we should affirm the judgment because of the overwhelming evidence of Soojian's guilt. The People argue that the spots of blood found on the steering wheel and the outside of the truck, the bloody work order, the bloody pants found under Soojian's mobilehome, and Joyce's identification of Soojian as the perpetrator provide virtually irrefutable evidence of Soojian's guilt.

Not only is this evidence refutable, but the People have failed to explain two glaring inconsistencies in the evidence. The People provide no explanation for the small quantity of blood found in the interior of the vehicle. According to declarations filed by Soojian, there should have been large quantities of blood in Soojian's vehicle. This conclusion is based on Joyce's injuries and on the amount of blood found on the work order. Nor can the People explain the presence of Joyce's California driver's license in Bolin's pickup. While the evidence pointing to Soojian as the perpetrator certainly was substantial, it was not overwhelming.

Moreover, as in *Martinez*, the new evidence presented by Soojian directly contradicted most of the People's evidence. The bloody pants found under Soojian's mobilehome appeared to be the wrong size to fit Soojian. Considering the rural area in which Soojian lived, if Soojian was the perpetrator, one would expect he would have found a better hiding place for such incriminating evidence. One could certainly argue that if Bolin was the perpetrator, he would have hidden the incriminating pants under Soojian's mobilehome and not the one in which he lived (which was located nearby). One also could argue that in so doing, Bolin could have deposited the blood on the outside of Soojian's pickup.

It appears undeniable that the bloody work order originated in Soojian's pickup. The testimony established that Soojian went to the prospective customer's house and began an estimate. Undoubtedly, at some point Soojian

tore the work order off his pad, leaving the small portion utilized by the People to establish that the work order was at some point in Soojian's pickup. But that is all that can be devined from the People's evidence. This evidence was sufficient to allow the jury to infer that the work order was in Soojian's pickup at the time of the assault. An alternative explanation, however, could have affected the outcome of this trial. Ruela's declaration provided an alternative explanation and also incriminated Bolin. While the witness was unable to state that the work order had been given to Bolin, her declaration certainly could have allowed the jury to infer the work order was in Bolin's pickup at the time of the assault.

It is difficult to explain how Joyce's blood ended up inside of Soojian's pickup if Soojian was not the perpetrator. But it also is difficult to explain why only a very small amount of blood was found inside the pickup when the undisputed evidence suggests that much more should have been present. Not only do the declarations from the experts retained by Soojian suggest much more blood should have been present, but the quantity of blood found on the work order suggests that Joyce bled significantly while she was in the perpetrator's vehicle. Soojian suggests the blood may have resulted from a transfer by investigators. We cannot explain how this blood ended up in Soojian's pickup. Nor can we conclude from this evidence that Soojian was the perpetrator when other blood evidence was inconsistent with the theory that the crime occurred in Soojian's pickup.[10]

Joyce's identification was, perhaps, the most damaging evidence implicating Soojian as the perpetrator. The evidence presented by Soojian, however, indicates that the validity of the identification is questionable. Joyce failed to describe the perpetrator as having a goatee, even though it is undisputed that at the time of the attack Soojian had a goatee. While this omission certainly raised questions in the first trial, the declaration submitted in support of the motion explaining the unlikelihood of such an omission raises serious doubts as to the identification.

"In the United States we have what is often called an 'adversarial system' of justice. [Citation.] However, because it is adversarial—as distinct from 'inquisitorial'—it is sometimes easy to forget that the purpose of the system is *not* to hold a contest for its own sake. The purpose of our system of justice is still, in Justice Traynor's phrase, 'the orderly ascertainment of the truth'

---

[10] At the hearing on the motion, the People argued there was no direct testimony that the inside of Soojian's pickup did not appear to be wiped down when officers first inspected it a few hours after the assault. We are confident the People would have presented testimony that the inside of the pickup appeared to have been wiped down if such testimony existed. The absence of a larger quantity of blood than actually found inside Soojian's pickup was an issue at trial. Testimony that Soojian, or someone else, recently had wiped down the pickup would have enhanced the People's case and explained the absence of blood.

(*Jones* v. *Superior Court* (1962) 58 Cal.2d 56, 60 [22 Cal.Rptr. 879, 372 P.2d 919]) and the application of the law to that truth." (*Guardianship of Simpson* (1998) 67 Cal.App.4th 914, 934–935 [79 Cal.Rptr.2d 389].) This goal, the ascertainment of truth and thereby avoiding unjust convictions, was the basis of the conclusion in *Martinez* that there will be occasions on which a motion for new trial should not be denied simply because trial counsel's lack of diligence resulted in otherwise relevant and persuasive evidence being omitted from trial.

Here, we have new evidence the trial court considered because trial counsel was diligent in attempting to locate the evidence, and evidence the trial court refused to consider because a diligent attorney could have presented it at trial. The trial court did not err in reaching these conclusions but, as explained above, we conclude that in this case the failure to consider all of the evidence will result in a miscarriage of justice. We are confident there is a reasonable possibility that if a jury were to consider all of the evidence, at least one juror would have voted to find Soojian not guilty.

We reach this conclusion, instead of remanding the matter to be considered again by the trial court using the correct standard, for several reasons. As explained above, the crime occurred over six years ago. Not only has a potentially innocent man been in custody this entire time, but over time witnesses' memories will fade and crucial evidence may be lost. Also, the trial judge who heard the case has been disqualified, thus there is no advantage in allowing a judge who has heard the evidence rule on the motion for a new trial. Finally, this is the second time this case has been before this court. If we remand for reconsideration of the motion, and the motion again is denied, we undoubtedly will face a third appeal, along with a petition for a writ of habeas corpus based on ineffective assistance of counsel.

We emphasize what we are, and are not, holding. We are not holding that Soojian is innocent. Nor are we predicting the retrial will result in a not guilty verdict or a hung jury.

We are holding that Soojian is entitled to a new trial because the new evidence creates a reasonable possibility that he will obtain a different result at retrial, i.e., at least one juror will find Soojian not guilty. We are holding that he is entitled to a trial in which all relevant evidence is presented and to a verdict based on all of that evidence. We are holding that this is one of the rare cases where the failure to present evidence undermines confidence in the outcome, resulting in a miscarriage of justice.

## DISPOSITION

The trial court's order denying the motion for new trial is vacated, and the trial court is directed to issue a new order granting the motion for new trial.

Dawson, J., and Kane, J., concurred.

A petition for a rehearing was denied December 16, 2010, and respondent's petition for review by the Supreme Court was denied March 16, 2011, S189422.