Filed 5/15/13  P. v. Garcia CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).   This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ALEXIS GARCIA,<br><br>    Defendant and Appellant. | B237920<br><br>(Los Angeles County<br>Super. Ct. No. BA261764) |

        APPEAL from an order of the Superior Court of Los Angeles County.   Robert J. Perry, Judge.  Affirmed.

        Corona & Peabody and Jennifer Peabody for Defendant and Appellant.

        Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant General, Lance E. Winters, Assistant Attorney General, Eric E. Reynolds and Ana R. Duarte, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Defendant Alexis Garcia was retried for the murder of Ricardo Castro (Pen. Code, § 187, subd. (a))[1] after the jury in his first trial deadlocked by a vote of six to six. During his second trial, the jury found defendant guilty of murder during the commission of which he personally and intentionally discharged a firearm, causing great bodily injury and/or death (*id.*, § 12022.53, subd. (d)). The jury further found that he committed the murder for the benefit of a criminal street gang (*id.*, § 186.22, subd. (b)(1)). The trial court sentenced defendant to state prison for a total term of 50 years to life.

Defendant appealed, contending among other things that he was denied access to important exculpatory evidence when the trial court denied his *Pitchess*[2] and *Brady*[3] motions, and the evidence was insufficient to establish his guilt beyond a reasonable doubt because there were numerous inconsistencies between the principal eyewitnesses' trial testimony, preliminary hearing testimony and pretrial statements. We concluded the jury was entitled to credit the eyewitnesses' identification of defendant as the shooter despite the inconsistencies in their statements but the trial court erred in denying his *Pitchess* motion. We therefore reversed the judgment and remanded the matter to the trial court for the limited purpose of conducting an in camera inspection of police personnel records and, if the files contained discoverable information, affording defendant an opportunity to establish that he was prejudiced by the denial of his motion. (*People v. Garcia* (Sept. 15, 2008, B197695) [nonpub. opn.].)

On remand, the trial court examined the police records in camera, concluded several complaints found therein against one of the investigating detectives were discoverable, and disclosed the information to defendant. Defendant then moved for new trial based on the newly discovered evidence, contending the complaints against the detective could have been used at trial to impeach his testimony and cast doubt on

---

[1] Undesignated statutory references will be to the Penal Code.

[2] *Pitchess v. Superior Court* (1974) 11 Cal.3d 531.

[3] *Brady v. Maryland* (1963) 373 U.S. 83 [83 S.Ct. 1194, 10 L.E.2d 215].

identifications made by the two eyewitnesses, which would have resulted in a different verdict. The trial court denied the motion and reinstated the judgment.

We conclude the trial court properly denied defendant's motion for new trial, and therefore affirm.

## BACKGROUND

We draw the operative facts from our prior opinion. (*People v. Garcia*, *supra*, B197695.) On the evening of March 5, 2004, Julieta Flores and her friend Maria Figueroa met Ricardo Castro, also known as Solo, at Main and Vernon Streets in Los Angeles. The group then proceeded to a liquor store at Wall and Vernon. A green Chevrolet Suburban was parked in front of the store. As she approached the store, Flores saw a man, later identified as Jose Rodriguez, walking out of the liquor store with a case of beer. Figueroa asked the man if she could have a beer; he said no. A second man, whom Flores identified as defendant, then exited the liquor store behind the man with the beer. Defendant, whose "whole face" Flores could see, appeared surprised to see Castro and "went straight to [Castro's] face." The two men appeared to be talking, but Flores could not understand what was being said. The confrontation between defendant and Castro lasted 15 seconds, after which defendant pulled a gun from his waistband and shot Castro.

Flores heard four shots. After the last shot, Castro grabbed his chest and walked into the store. Flores went outside to call for an ambulance and saw the green Suburban driving away. Castro was taken to the hospital, where he died from his injuries. Unbeknownst to Flores, Castro was a member of the Playboys gang. During a car wash held in his honor days after the shooting, Flores saw a picture of him in which his gang tattoos were visible.

Flores spoke with police after the shooting. She described the shooter as a 20- or 21-year-old Hispanic man, 5 feet 8 inches to 5 feet 10 inches tall, weighing 160 to 170 pounds and wearing a blue sweater with hood and dark jeans. Flores described the man carrying the beer as having a mustache, goatee and a "chunky" build. He was wearing a baseball hat with a white T-shirt.

3

Three days after the shooting, on March 8, 2004, Los Angeles Police Detective Richard Arciniega interviewed Flores at her home. Flores described the shooter this time as a Hispanic male, 5 feet 8 inches or 5 feet 9 inches tall, with a medium build and a light complexion. His gun was a semi-automatic handgun. Flores also described the man carrying the beer as Hispanic, 5 feet 7 inches to 5 feet 8 inches tall, with a "chunky" build, light complexion, a mustache and goatee. Flores did not mention seeing a green Suburban leaving the scene.

According to Flores, she described the shooter to Detective Arciniega as a Hispanic man, 5 feet 8 inches to 5 feet 10 inches tall, with a light complexion and medium build. She estimated the shooter's age at 20 or 21 years, his weight as 160 to 170 pounds, and described his gun as black. Flores described the man carrying the beer as having a "chunky" build, a light complexion, a mustache and goatee. He was 5 feet 7 or 8 inches tall and wore a baseball cap and a white shirt.

Also on March 8, 2004, Detective Arciniega went to Figueroa's home and discussed the incident with her. Figueroa stated she had spoken to the man carrying the beer. It was the other man who confronted Castro. Figueroa mentioned that she had been at a car wash the previous day and heard people say that members of 41st Street gang were responsible for the shooting. Based on what Figueroa overheard at the car wash, Detective Arciniega arranged for an array of photographs of members of the 41st Street gang to be compiled.

Detectives also interviewed Eduardo Cabrera, who was working in the liquor store on the night Castro was shot. According to Cabrera, the people who bought beer were 41st Street gang members and had been in the store previously. Cabrera viewed a photographic array comprised of 16 pictures and identified the man in photograph 1 as the person who purchased the beer and the man in photograph 16 as the person who

4

accompanied the man with the beer. Cabrera also stated that the individual in photograph 16 had been wearing a hood and a sweatshirt.[4]

The next day, March 9, 2004, Figueroa was interviewed further at the police station. After viewing the photograph array, Figueroa identified the man in photograph 1 as the man who purchased the beer and defendant, who was depicted in photograph 16, as the man who argued with Castro. Figueroa reviewed her statement and signed it.

Rodriguez was the man in photograph 1. According to Detective Arciniega, Rodriguez was about 5 feet 6 inches tall and had a "stocky, chunky" build. At the time of the shooting, Rodriguez was 24 or 25 years old.

Also on March 9, Flores was brought to the police station and interviewed. She too selected the man in photograph 1 as the one who bought beer and identified defendant, pictured in photograph 16, as the man who shot Castro. Flores also reviewed her statement and signed it. At trial, both Figueroa and Flores identified defendant as the man who shot Castro.

In an interview held on March 9, Cabrera again identified the person in photograph 1 as the man who purchased the beer. With regard to the man in photograph 16, Cabrera said he had been "wearing a hood and sweatshirt and was with the guy who bought beer." Cabrera described Castro as a regular customer and a young gang member. Cabrera had seen defendant and Rodriguez together in the past.

According to Los Angeles Police Officer Jose Calzadillas, a gang expert, the 41st Street gang and the Playboys gang were rivals with "a lot of bad blood" between them. Officer Calzadillas opined that the shooting was committed for the benefit of the 41st Street gang. The liquor store at which the shooting occurred was "right on the border" between Playboys and 41st Street territory, and each gang considered the liquor store to be part of its territory. Defendant is an admitted member of the 41st Street gang and

---

[4] At trial, Cabrera believed that defendant had been in the store on the night of the shooting, but he was not 100 percent sure.

displays 41st Street gang tattoos. The presence of a rival gang member in gang territory would be considered a challenge to the gang.

Officer Calzadillas viewed the photographic array shown to the witnesses. The officer recognized Rodriguez, the man depicted in photograph 1, as "Thumper." This individual had several large tattoos signifying his membership in the 41st Street gang.

Defendant was arrested on June 24, 2005. At the time, he was in possession of glasses but was not wearing them. Defendant also was in possession of an identification card and check-cashing card, bearing his picture, but issued in the name of Antonio Alvarez. In neither picture was defendant wearing glasses. Arresting Officer Todd Bracht, who was familiar with defendant as a result of prior contacts, observed that defendant was 20 or 30 pounds heavier than he had been in the past.

At trial, Marta Martinez, defendant's mother, testified defendant has worn glasses since 1994 or 1995. Defendant's supervisor testified that defendant always wore glasses at work. No eyewitness had described defendant as wearing glasses.

Prior to his retrial, defendant filed a *Pitchess* motion, seeking to examine the personnel records of Detective Arciniega for accusations of misconduct, arguing the eyewitnesses identifications in the first trial had been "tainted by collusion with other witnesses and by Police suggestion and intimidation." Defendant further argued there was "evidence that officers had manipulated witness statements and withheld evidence from the defense." The trial court denied the motion, but we reversed, concluding defendant had made a sufficient showing of good cause to warrant the trial court's in camera review of Detective Arciniega's police personnel records. We remanded with directions for the trial court to conduct an in camera hearing and disclose to defendant any discoverable information. We also instructed the trial court to afford defendant an opportunity to establish that he was prejudiced by any denial of discoverable information and, if he succeeded in doing so, order a new trial.

The court reviewed Detective Arciniega's personnel records on January 9, 2009. It found eight pertinent complaints had been made against him between 1997 and 2006 for filing false police reports, giving false testimony, tampering with photographic

6

identification lineups, and coercing confessions. Of particular note was a complaint by the wife of one Marcelos Moore, who alleged that in 1997 Arciniega showed several mug books to witnesses to a home invasion robbery. The witnesses identified an individual other than Moore as the perpetrator, but Arciniega failed to include those identifications in his police reports. Moore had raised the issue at trial and cross-examined Arciniega about the mug photos, but was nevertheless convicted of robbery and sentenced to eight years in prison.

On January 9, 2009, the trial court ordered the Los Angeles Police Department's custodian of records to disclose to defendant the eight pertinent complaints and the contact information of the complainants. On February 2009, the department produced the information as ordered.

A year and a half later, On July 30, 2010, defendant's counsel filed a motion for new trial. Counsel argued that in several cases Detective Arciniega was alleged to have fabricated false police reports, given false testimony, and withheld exculpatory portions of witness interviews. For example, in one instance documented in an internal report created by the Los Angeles Police Department, Arciniega, "[a]ccording [to] the witnesses," fabricated a false confession. In another instance, which resulted in a civil lawsuit, Arciniega "allegedly used excessive force against [a suspect] and then participated in a cover-up." Defendant's counsel also cited a criminal trial where the defendant's counsel alleged Arciniega engaged in """"psychological intimidation"""" of the defendant. In "another serious" but otherwise unidentified criminal case, defendant's counsel argued Arciniega maintained selective recordings of interviews and lied to the defendant. Finally, defendant's counsel argued Arciniega gave false testimony in two more criminal cases. "Beyond the above," counsel argued, "there are complaints of police misconduct of dishonesty by Detective Arciniega [by] several other witnesses," all of whom counsel intended to call at the September hearing on the motion for new trial. Defendant argued he was prejudiced in the second trial because the court's denial of his *Pitchess* motion rendered him unable to call these witnesses to impeach Arciniega's testimony and cast doubt on the eyewitness identifications.

7

In opposition to the motion for new trial, the People argued none of defendant's allegations of misconduct by Arciniega was supported by evidence. (§ 1181 ["When a motion for a new trial is made upon the ground of newly discovered evidence, the defendant must produce at the hearing, in support thereof, the affidavits of the witnesses by whom such evidence is expected to be given, . . ."].) Defendant had produced no evidence of any kind, the People argued, merely allegations.

On the morning of October 28, 2010, shortly before the hearing on defendant's motion for new trial and more than a year and a half after Arciniega's records were produced, defendant filed a reply to the People's opposition and a declaration by Moore that was dated two days prior. Defendant's counsel argued that in yet another criminal case, which counsel identified as "People v. Miguel Chavez #BA263421," the "defendant was acquitted after a tape was played while Arciniega was on the stand which directly contradicted his assertion of a Defendant's admissions off-tape."

In his declaration, Moore stated he had had two negative encounters with Detective Arciniega in 1997. In the first, Arciniega and other officers physically assaulted Moore during an arrest and falsely reported that he had shot at them. In the second, Arciniega showed a robbery victim an array of photographs that contained Moore's photo. The victim positively identified Moore as one of the robbers. Moore admitted he had participated in the robbery but argued the victim never saw his face because before he entered the victim's residence, his accomplice had ordered the victim to lie "down on the ground with his face facing the floor." It was therefore "impossible" for the victim to have identified Moore "because he was never in a position to have seen" him. Furthermore, after Arciniega arrested Moore, he placed a bag of rock cocaine and a gun in his lap and threatened to charge him with possession of the cocaine and the gun if Moore did not implicate other accomplices in the robbery. When Moore refused to implicate anyone, Arciniega removed the items and booked him only on the robbery.

At the hearing on defendant's motion for new trial, his counsel argued that his personal experience with Detective Arciniega, the number of complaints against the officer, and the weakness in the case against defendant established prejudice.

8

The trial court disagreed. It found the number of complaints was not dispositive and defendant offered little admissible evidence of wrongdoing by Detective Arciniega, and that which was offered failed to establish that defendant would have taken a different approach at trial or that the jury would have reached a different verdict had the evidence been obtained earlier. This was so because at trial the defense relied heavily on the theory that Flores and Figueroa had been coached, and defense counsel ably and aggressively explored the issue in his cross-examination of the two witnesses and Arciniega. The court observed that the jury discredited the defense theory, and no reasonable probability existed that a different result would have been reached had the jury been aware of Moore's complaint. It thus denied the motion.

## DISCUSSION

"Evidence Code sections 1043 through 1045 codify *Pitchess v. Superior Court*[, *supra*,] 11 Cal.3d 531. 'The statutory scheme carefully balances two directly conflicting interests: the peace officer's just claim to confidentiality, and the criminal defendant's equally compelling interest in all information pertinent to the defense.' [Citation.] The legislation achieves this balance primarily through a procedure of in camera review, set forth in section 1045, subdivision (b), whereby the trial court can determine whether a police officer's personnel files contain any material relevant to the defense, with only a minimal breach in the confidentiality of that file." (*People v. Jackson* (1996) 13 Cal.4th 1164, 1220.)

Here, defendant argued eyewitness identifications in the first trial were tainted by police suggestion, intimidation, and manipulation, and requested discovery of complaints of police misconduct, witness manipulation, and withheld evidence. Defendant's request was denied, and he was subsequently convicted in a second trial.

We reversed the judgment of conviction for the limited purpose of affording defendant an opportunity to demonstrate he was prejudiced by denial of discovery or the prosecution's failure to disclose exculpatory material. We instructed the trial court as follows: "The matter is remanded to the trial court for the limited purpose of (1) conducting an in camera inspection of Detective Arciniega's and Detective Villa's

9

police personnel records and ordering the disclosure of relevant information, if any, and (2) granting defendant's *Brady* request and giving defendant an opportunity to establish prejudice resulting from the prosecution's withholding of any potentially exculpatory evidence. If the trial court concludes that the detectives' personnel files contain discoverable *Pitchess* information and defendant establishes that he was prejudiced by the denial of its discovery or defendant establishes he was prejudiced as a result of the prosecutions' failure to disclose the *Brady* material, then the trial court is directed to order a new trial. If there is no discoverable *Pitchess* information in the detectives' personnel files or if defendant is unable to establish he was prejudiced at trial as a result of the improper denial of his *Pitchess* motion or *Brady* request, then the trial court is ordered to reinstate the judgment and the judgment is affirmed." (*People v. Garcia*, *supra*, B197695.)

Defendant requests that we independently review the resulting in camera proceedings below to determine whether the trial court properly exercised its discretion in ordering or denying discovery. (*People v. Mooc* (2001) 26 Cal.4th 1216, 1228; *People v. Wycoff* (2008) 164 Cal.App.4th 410, 414-415.) We have done so, and find no abuse of discretion. (*People v. Mooc*, *supra*, 26 Cal.4th at p. 1228.) On remand, only complaints by persons who alleged coercive techniques in identification procedures were relevant to defendant's theory that the witness identifications were unreliable. The trial court nevertheless reviewed all complaints in Detective Arciniega's personnel file and found eight that were relevant. Based on our review of the reporter's sealed transcript of the proceedings, this was proper.

The real issue is whether the initial denial of discovery of the eight relevant complaints in Arciniega's file prejudiced defendant. We conclude it did not.

"[A] defendant who has established that the trial court erred in denying *Pitchess* discovery must also demonstrate a reasonable probability of a different outcome had the evidence been disclosed." (*People v. Gaines* (2009) 46 Cal.4th 172, 182.) One possible different outcome would be a hung jury. (*People v. Soojian* (2010) 190 Cal.App.4th 491, 521.) To assess whether a different outcome was reasonably probable the court must

10

"""consider the non-disclosure dynamically, taking into account the range of predictable impacts on trial strategy.""  [Citation.]"  (*People v. Gaines*, at p. 184.)  "[W]e must find both (1) a reasonable possibility defense counsel would have presented the mitigating evidence had he received the discovery he requested (otherwise the error would not have affected the trial at all), and (2) a reasonable possibility the verdict would have been different had defendant presented the mitigating evidence."  (*People v. Gonzalez* (2006) 38 Cal.4th 932, 961.)

Here, defendant's counsel was armed with some dozen complaints and possible complaints against Arciniega, eight from the *Pitchess* proceedings and several more from counsel's own experience or knowledge.  Yet after approximately a year and a half counsel was able to generate only one piece of evidence:  the declaration of Moore, an admitted robber, to the effect that a photographic identification of him in 1997—an accurate identification—must have been fabricated because during the robbery in question the victim was "down on the ground with his face facing the floor," and could not have seen him.

We will assume for the sake of argument that it is reasonably possible the defense would have offered Moore's testimony at trial had it received Moore's wife's complaint against Detective Arciniega in a timely fashion.  This may be a generous assumption, as it apparently took defense counsel more than a year and a half after the *Pitchess* hearing to obtain Moore's declaration.  Even had Moore testified at trial, no reasonable probability exists that the verdict would have been different.

The gist of Moore's evidence would have been that in 1997 Detective Arciniega caused a witness to falsely identify him, implying Arciniega did the same here with Flores and Figueroa.  Moore's evidence would have been of negligible weight.  His only expressed reason for thinking the 1997 identification was manipulated was not that he was innocent but that the witness was face down throughout the subject robbery, and therefore could not have got a good look at Moore's face.  The weakness and unreliability of such testimony is patent.  In any event, the jury already possessed circumstantial evidence, albeit weak, that Flores and Figueroa had been coached in their identifications:

11

The identifications evolved over time.  The jury also knew about defendant's theory that the discrepancies resulted from Arciniega's coaching.  The jury nevertheless believed Flores and Figueroa accurately identified defendant as the person who shot Castro.  Because Moore's speculation regarding the genesis of his own admittedly accurate identification 10 years before the trial in this case would have added little to what the jury already knew about Flores, Figueroa and Arciniega, we cannot conclude any reasonable probability exists that it would have made a difference.

Accordingly, the trial court was well within its discretion to find that defendant suffered no prejudice as a result of having been denied *Pitchess* discovery.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED.


                                                    CHANEY, J.


We concur:



        MALLANO, P. J.



        ROTHSCHILD, J.



12