Filed 5/23/14  P. v. Trejo CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B247232 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. YA083223) |
| v. | |
| AUGUSTINE DANNY TREJO, | |
| Defendant and Appellant. | |

APPEAL from a judgment (order) of the Superior Court of Los Angeles County, Victor L. Wright, Judge.  Affirmed.

Kevin D. Sheehy, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Victoria B. Wilson and Brendan Sullivan, Deputy Attorneys General, for Plaintiff and Respondent.

# INTRODUCTION

On September 27, 2011, someone shot and severely wounded Levester Peterson. Immediately after the shooting, and again after surgery and at trial, Peterson identified the shooter as defendant Augustine Danny Trejo, a man he recognized from his neighborhood. On the strength of Peterson's eyewitness testimony, a jury convicted defendant of attempted premeditated murder and intentional discharge of a firearm, and the court sentenced defendant to a state prison term of 35 years to life.

After the conviction, but before the sentencing hearing, the defense attorney was contacted by Elvin Crosby, also called "Pete," who Peterson testified had witnessed the shooting. Crosby agreed that he had seen the shooting, but told a defense investigator and police detective that the shooter was taller and heavier than defendant. On the basis of Crosby's statement, defendant made a motion for a new trial. Crosby testified at the hearing on the new trial motion, but his testimony was equivocal and contradictory, sometimes suggesting that defendant was not the shooter, but other times admitting that he had not seen the shooter's face and could not identify the shooter. The trial court denied the motion, concluding that it was not reasonably likely that Crosby's testimony would have yielded a different result at trial.

We affirm. A defendant is entitled to a new trial only if a different result is "probable" on retrial—i.e., if there is "'a reasonable chance, more than an abstract possibility'" that "at least one juror would have voted to find [defendant] not guilty had the new evidence been presented." (*People v. Soojian* (2010) 190 Cal.App.4th 491, 519-521 (*Soojian*).) In light of the inconsistencies in Crosby's testimony and Crosby's admitted inability to see the shooter's face, we do not believe there is a reasonable likelihood that Crosby's testimony would have resulted in a different verdict.

**FACTUAL AND PROCEDURAL BACKGROUND**

Defendant was charged by information on March 13, 2012, with the attempted willful, deliberate, and premeditated murder of Levester Peterson (Pen. Code,**[1]** §§ 664, 187, subd. (a)) (count 1), and assault with a firearm (§ 245, subd. (a)(2)) (count 2). The information further alleged: As to count 1, that defendant personally and intentionally discharged a firearm, causing great bodily injury (§ 12022.53, subd. (d)); as to both counts, that the offense was committed for the benefit of, at the direction of, and in association with a criminal street gang (§ 186.22, subd. (b)(1)(C)), and defendant personally inflicted great bodily injury on the victim within the meaning of section 12022.7, subdivision (a); as to count 2, that defendant personally used a firearm within the meanings of sections 12022.5, 1192.7, subdivision (c), and 667.5, subdivision (c); and that defendant suffered a prior strike adjudication pursuant to sections 1170.12, subdivisions (a)-(d), and 667, subdivisions (b)-(i).

The case was tried to a jury. The evidence adduced at trial was as follows.

## I.     Prosecution Case

### A.     *Levester Peterson*

On September 27, 2011, between 10:30 and 11:00 p.m., Levester Peterson was in front of the Lotus Motel on the 400 block of West Manchester Boulevard in Inglewood.**[2]** Peterson saw defendant walking up the street with a bicycle. Defendant asked Peterson "was I from NHP.**[3]** I said 'Yes.' I said, 'Are you from Pecks?'**[4]** He said, 'No, I'm

---

**1**     All further statutory references are to the Penal Code.

**2**     Witnesses sometimes referred to the Lotus Motel as the Lotus "Hotel." For consistency, we refer to it throughout this opinion as the Lotus Motel.

**3**     "NHP" stands for Neighborhood Pirus, a Blood gang.

**4**     Peterson testified that "Pecks" is a pejorative name for Inglewood Trece, a rival gang. He said that by referring to the gang as "Pecks," he was "[d]isrespecting them,

3

from M.S.,'[5] then he asked me for a cigarette." Peterson said he did not have a cigarette and asked defendant what his name was. Defendant said "it was something with a 'T.' I couldn't understand it. Like a Spanish name, maybe his last name." Defendant was about five feet from Peterson during this conversation. Defendant was wearing a black sweatshirt hoodie, black shorts, and either black or grey shoes. Defendant told Peterson he had a west side tattoo on the back of his neck by his left ear and "flashed it real quick." After this conversation, defendant walked through the driveway to the back of the motel.

Peterson continued to wait outside the Lotus Motel for a female friend, who eventually arrived. They went to Peterson's room, smoked $25-$30 worth of crack cocaine, and had sex. When they finished at approximately midnight, Peterson walked his friend downstairs, passing defendant on the right hand side of the stairs as he did so. Defendant was on his phone, texting. Defendant and Peterson did not speak to one another. Peterson then began walking to a 7-Eleven to get something to eat.

When Peterson was about two or two-and-a-half buildings from the motel, he heard four gunshots. He could not tell from what direction the gunshots were coming. He saw his friend "Pete" across the street, who yelled Peterson's name and told him to run. When Peterson turned around, "Mr. Trejo was standing about five to eight feet behind me, and I'm like, 'What's up, dog. You shooting at me?' He said, 'Yeah. Fuck you, homes.' And I could see the gun in his right hand and it was down like this. And when he said that, he pointed it up, and I took off running." The gun was a large

---

basically." Peterson asked defendant if he was from Pecks because "they do a lot of shootings in my neighborhood and they hit a lot of innocent people. I dislike them. I don't like them any more at all. Even though I'm not active, I still don't have a liking for them. So I mean, I can be active, but I'm not active. And for somebody to approach me and ask me what gang I'm from, that's almost like turning the light switch back [on]. So I was getting in mode to be ready for anything he was going to bring if he had said 'Yes,' which he didn't."

[5]     "M.S." refers to Mara Salvatrucha 13. Peterson said his gang "don't beef with [M.S.]. I have no problems with any of them. So it was like, okay."

4

semiautomatic handgun. Peterson ran away from defendant, who began firing at him. When defendant shot at Peterson, Pete was across the street at a Carl's Jr. restaurant, about 80 yards away.

Peterson's leg became numb and he realized he had been shot. By then, "I was in the left-hand turning lane on Manchester getting ready to make the left on Inglewood Avenue. And Pete met me in the middle of the intersection and he grabbed me, picked me up, because I almost collapsed, and he carried me over to 7-Eleven." Pete and Peterson yelled for someone to call 911. Police and paramedics arrived two or three minutes later. An officer asked Peterson what happened and he described the shooter as a "[b]aldheaded Mexican, all black, black hoodie, black shorts, black shoes" with "a west side [tattoo] on the back of his ear." One of the officers said, "I know exactly who that is," and the officers left.

Peterson was in the hospital for more than two months and required two major surgeries. He later learned that the bullet had nicked his bladder and shattered his left hip, among other injuries. As of the time of trial, the bullet was still lodged in Peterson's leg. He walked with a limp, was unable to run, and wore a colostomy bag.

While he was in the hospital, Peterson spoke with Detective Marya Parente and described what had happened. The detective showed him photographs, telling him that the shooter "may or may not be on this sheet of paper." Peterson immediately identified defendant as the shooter.

Peterson said he had been living at the Lotus Motel on and off for about six weeks before the shooting. He had seen the defendant at the motel three times, but he did not know defendant's name and had nothing against him. The first time, about four weeks prior to the shooting, defendant had been in the motel parking lot, working on a car with a friend. The second time, about three weeks before the shooting, defendant was again in the motel parking lot; Peterson and defendant nodded at each other and said, "What's up?" The third time, four or five days before the shooting, Peterson saw defendant walking from the 7-Eleven with a friend. That time, Peterson thought defendant and his

5

friend were "mocking me . . . [l]ike when I stop, they stop.  When I start walking, they start walking."

Peterson said he was a member of a Blood gang known as NHP or Neighborhood Pirus.  He had been inactive for about four years, but he was still a member.  Peterson was aware of a gang called Inglewood Trece or Inglewood 13.  The Lotus Motel bordered territories claimed by Inglewood Trece and Queen Street Bloods.  NHP and Inglewood Trece had been "at war"—i.e., "[f]ighting, shooting"—since about 2004.

Peterson had been using cocaine regularly for about six years before the shooting.  In the weeks immediately prior to the shooting, he had been using $20 to $40 of cocaine approximately every other day.  Cocaine had two different effects on Peterson:  "It either heightens my sexuality or it enhances it, or there's a street term called 'stuck status.'  Like it'll make you got like — I want to say like retarded, stupid, and you sit there and stare at something for a while."  Typically, when he took a hit, the effect of the cocaine lasted five to seven minutes.  The day of the shooting, Peterson had smoked cocaine in the morning and then again an hour and a half or two hours before he was shot.  He had taken six or seven hits, each of which lasted five to seven minutes.  The cocaine "enhances the sex," but had no effect on Peterson's vision or hearing.  Peterson had stopped smoking at least an hour before he left the motel to get something to eat.  By then, the cocaine was no longer affecting him.

Peterson said that when he used cocaine on a regular basis and then stopped using, he occasionally became irritable, but never paranoid.  When he first heard gunshots the night he was shot, he did not immediately start running because "I'm used to being shot at, and I'm a gang member and you find out where the bullets are coming from [before] you run so you don't get hit."

Peterson testified that he did not know the last name of his friend Pete and did not know where Pete lived.  Pete was "a smoking buddy," not a gang member.  Peterson believed Pete lived around the area where he was shot, but he did not know if Pete was homeless.  Peterson believed Pete had been in a position to see what happened.

6

When Peterson saw defendant on Manchester with the gun in his hand, the lighting was "[a]bout as good as it is in here [the courtroom]." At the time of the shooting, Peterson was able clearly to see the defendant, who was wearing the same clothes he had been wearing a few hours earlier. Peterson had no difficulty identifying or seeing the defendant.

### B.     Guadalupe Andara

Andara is defendant's mother. On September 27, 2011, she had been staying at the Lotus Motel for a few months with her husband and three of her children. Defendant stayed with her sometimes, but he did not live in the motel. Andara saw defendant at the Lotus Motel in the early evening of September 27, 2011. She never saw defendant with a firearm.

### C.     Officer Ryan Green

Officer Green responded to the Lotus Motel the night of the shooting. Peterson told Officer Green he had been shot by a male Hispanic wearing a black hooded sweatshirt and black pants, with W.S. or M.S. tattooed on the back of his neck. Peterson said he knew the suspect because he was staying in room nine of the Lotus Motel and the suspect had asked him for a cigarette prior to the shooting. During the conversation, Peterson spoke clearly, was responsive, and did not slur his speech. Officer Green thought Peterson might be describing the defendant, whom the officer had stopped a couple of weeks earlier at a nearby liquor store. During that stop, defendant had claimed to be affiliated with the Inglewood 13 gang.

After speaking with Peterson, Officer Green knocked on the door of room nine at the Lotus Motel. Andara answered the door and said defendant was her son. The officers walked through the motel room but did not find defendant.

Officer Green testified that the area on Manchester between the Lotus Motel and the 7-Eleven was well lit.

7

### D.    Officer Heriberto Quintanna

Officer Quintanna responded to the Lotus Motel the night of the shooting.  He recovered five .9 millimeter shell casings collected at the scene.

### E.    Officer Jose Barragan

Officer Barragan is a member of the Inglewood Police Department's gang unit. He has been assigned to monitor the Inglewood 13 for about five years.

Defendant is a member of the Inglewood 13 gang and has the moniker "Beaver." Defendant has many tattoos, including the letters "W.S." (West Side) tattooed below his left ear.  "West Side" refers to the west side of Los Angeles, which includes Inglewood.

Peterson is a member of the NHP, one of Inglewood 13's rivals.  The NHP's are predominantly African-American.

"Pecks" or "Pecker Woods" is a disrespectful way to refer to the Inglewood 13.  If a gang member is referred to disrespectfully and does nothing about it, "they'll be considered as being weak or not being able to pretty much hold their own on the street, which is huge in the gang world."  Gang members typically do not report crimes committed by rival gang members to the police because "it's about clean[ing] up their own business, taking care inhouse."  If a gang member reports a crime committed by a rival gang member to the police, he is in danger from both his own and the rival gang.  In the officer's experience, a gang member involves the police only when he does not want to be involved with the gang any more.

### F.    Detective Marya Parente

Detective Parente was assigned to investigate Peterson's shooting.  When Detective Parente interviewed Peterson in the hospital, he said he knew who had shot him and could identify the shooter.  The detective showed Peterson six photographs, and he "immediately got emotional and said, 'That's him.  That's the guy.'  And pointed to [defendant]."  Peterson also said that at about the time he was shot, he encountered a man

8

named "Pete" across the street. The detective attempted to find Pete, but she was unsuccessful.

## II. Defense Case

Dr. Gordon Plotkin is a psychiatrist and has a Ph.D. in chemistry. He testified that cocaine initially causes euphoria; it can also cause a user to feel anxious, jittery, and to experience tremors. The effect is more immediate with crack cocaine, which is smoked, than with other forms of cocaine. Chronic stimulant users often experience paranoia; cocaine can also cause hallucinations, although they are fairly uncommon. If a person is using cocaine regularly, it is unlikely that he will not experience paranoia: "If you're doing it for couple hours and taking multiple hits, you're going to have . . . some symptoms of paranoia at the end of that because that's what that drug does. You may not be able to perceive it because you're feeling euphoria or feeling energy. But if I actually sat down with that person, one of the symptoms that I would get would be paranoia." The paranoia "is more global. It's not like a paranoid delusion where it's one person, one thing after you like, 'All police are after me.' It's more of a global feeling. So it's more of if there's a group there, I'll misinterpret that they're watching me. If the cars [are] coming down the street, I'll misinterpret that they may be surveilling me . . . or a noise in the back may be people climbing over the fence. It's more of a global paranoia."

If a person is a regular user of cocaine and uses a relatively small amount, the high will "come and go pretty quick." However, if a regular user takes multiple hits six or seven minutes apart, the high will last at least an hour, probably two hours.

## III. Conviction and Sentencing

On September 24, 2012, the jury found defendant guilty of attempted premeditated murder and assault with a firearm, and found true the allegations that defendant personally and intentionally discharged a firearm, inflicted great bodily harm on the victim, and committed the offense for the benefit of a criminal street gang. Subsequently,

9

the jury found true the allegation that defendant suffered a prior conviction of a serious or violent felony.

As to count 1, attempted premeditated murder, the court sentenced defendant to a term of life with the possibility of parole (§§ 664, 187, subd. (a)), plus a gang enhancement of 10 years (§ 186.22, subd. (b)(5)) and a weapon enhancement of 25 years (§ 12022.53), for a total aggregate state prison term of 35 years to life. As to count 2, assault with a firearm, the court imposed a life sentence, but stayed the sentence pursuant to section 654.

## IV. Motion for New Trial

### A. *Motion and Opposition*

On November 14, 2012, defendant moved for a new trial on the grounds that "Pete," whose real name is Elvin Crosby, had been located and could provide exculpatory evidence. The motion stated that a few days after the verdict, someone referring to himself as "Pete" left a message on defense counsel's voicemail. He was interviewed by a defense investigator on October 16, 2012. According to the investigator's report, Crosby said that at about 11:30 p.m. on the evening of the shooting, he was stopped by a Hispanic male who threatened him with a gun. Shortly thereafter, "he saw the victim walking southbound across Manchester Blvd. from just east of the [Lotus] Motel. When the victim got about halfway across Manchester, he (victim) began to run towards Crosby's direction. About the same time, Crosby observed the suspect running approximately 60 feet-70 feet behind the victim. When the suspect reached the south sidewalk of Manchester, the suspect stopped and then began shooting at the victim who was at that time running eastbound on the south sidewalk of Manchester, towards the direction of Crosby. Crosby estimated that the suspect had fired 12 to 15 rounds at least, one of which struck the victim. Once the suspect finished firing, he then took off running back towards the direction he came from. Mr. Crosby stated that he is 100% certain that the individual who shot the victim was the same man who confronted Crosby

10

approximately 1/2 hour before. [¶] Crosby described the shooter as a male Hispanic, approximately 6'0"-6'1" and heavy, weighing approximately 250-260 lbs."

The People opposed the motion for new trial, submitting in support a taped interview of Crosby by Detective Parente. The People argued that Crosby's "apparent certainty" regarding the identity of the shooter "is flatly contradicted by statements made by him during Detective Parente's interview," including that he did not see the shooter's face, could not determine the shooter's ethnicity, and believed the shooter was the same person who confronted him earlier based only on the shooter's clothing. During his interview with Detective Parente, Crosby said that he initially was approached by defendant's grandmother, who asked him to contact the defense investigator. He did not know how defendant's grandmother got his address or phone number. Regarding the shooting, Crosby said that a large Hispanic man with a tattoo on his neck pulled a gun on him about 30 to 45 minutes before Peterson was shot. Crosby believed that the man who pulled the gun on him was the same man who shot Peterson because the two men had approximately the same build and were similarly dressed. However, all Crosby could see of the shooter was a "tall black figure, 50 feet away, shooting." He could not see the shooter's face or ethnicity, nor could he say with certainty that the shooter was the same man who pulled a gun on him. In contrast, Crosby said, "When he [Peterson] looked back he *knew* who was chasing him." He concluded: "If that's what [Peterson] said who shot him — I didn't say he *wasn't* the one who shot him. I said it didn't look like the guy who pulled a gun *on me*."

### B. *Crosby's New Trial Testimony*

Crosby appeared at the hearing on the new trial motion and testified that he was on Manchester Boulevard on September 27, 2011, when Peterson, whom Crosby knew as "J-Steel," was shot. At about 11:00 that night, Crosby had visited Peterson at the Lotus Motel. Peterson was "[j]ittery . . . kept looking at his window, and made me get up, and leave." Peterson seemed "paranoid," to be "[e]xpecting something." About 15 minutes later, Crosby, who is 5 feet 9 inches tall, was walking down Manchester when a

11

"Hispanic guy came out of nowhere[,] called me names, and pulled a gun on me." The gunman was at least six feet tall, "230, 250" pounds, and had "little baby teeth." He was wearing a black hoodie, black jeans, or black sweats. When the gunman confronted Crosby, his hoodie was over his head. The gunman told Crosby "to get my black ass off the street, or he'd smoke me. Told me to turn around, and run. I said, 'I'm not going to turn around,' but I backed away, made my way across Manchester." Before he backed away, Crosby looked at the gunman in the face because "I'm not going to be shot in the back and don't see who's shooting me."

Crosby saw Peterson again at about midnight. Crosby was near the intersection of Inglewood and Manchester when he saw Peterson walk from the Lotus Motel across Manchester. Peterson took a look over his shoulder and then started running, first across the street, and then east towards where Crosby was standing. Crosby did not see Peterson look back as he ran. Crosby then saw a shooter fire one or two shots from the middle of the street and continue to the sidewalk. Crosby got down on the ground as the shots continued. He saw or heard 15 to 17 shots fired. Crosby was about 50 to 80 feet away from the shooter during the shooting; Peterson was about 50 or 55 feet from the shooter. The street was dark and Crosby could not see the shooter's face or determine his ethnicity.

Crosby realized Peterson had been hit when he called out. Crosby had not yelled a warning to Peterson or encouraged him to run faster. After the shooting stopped, Crosby went into the 7-Eleven and asked them to call 911. He was still on the scene when officers arrived, but he did not stay to be questioned.

Crosby testified that the person who pulled a gun on him was more than six inches taller than defendant. The man who shot Peterson was also more than six inches taller than defendant. The parties stipulated that the defendant is about five feet eight inches tall, and Peterson is about six feet tall.

Crosby's testimony about the identity of the shooter was inconsistent. At one point during his testimony, Crosby said he believed the man who shot at Peterson "was the same person" who pointed a gun at Crosby earlier:

"Q     How would you compare the appearance of the figure you saw shooting at the time J-Steel was shot, with the person [who] accosted you an hour before?

"A     I would say it was the same person.

"Q     And what makes you think that?  . . .

"A     He was big, and had on black. . . .

"Q     And as far as what you could see of the gunman's height as he was in the street shooting, did his height or his build differ in any way from the person you saw up close and personal an hour before?

"A     No."

Subsequently, however, Crosby said he "didn't say that" the person who pulled the gun on him was the same person who shot Peterson:

"Q     So you think that this person who pulled the gun on you was the same person who shot J-Steel?

"A     I didn't say that.

"Q     What did you say?  This is important.

"A     I know it is very important, sir.

"Q     So summarize it again.  It seemed like when you were talking to [defense counsel] that you said you believe the person that shot J-Steel is the person that pulled the gun on you?

"A     Yes.

"Q     Is that true?

"A     Yes.

"Q     Why?

"A     Because he looked like him.  He was tall, heavyset, and had on all black. Same person, the description that guy the [*sic*] pulled the gun on me.

"Q     So you say that despite not being able to tell what the person's race was?

"A     Yes.

"Q     You say that despite — so is it true to say you were not able to get a look at the shooter's face?

13

"A     Yes.  I did not get a look at the shooter's face.

"Q     So you don't know who the shooter was?

"A     No, I don't.

"Q     So you think it's the same person based only that he appeared to be heavyset and was wearing dark clothes?

"A     Yes.

"Q     And you're making these[] observations from a distance of about 50 feet in the dark?

"A     Yes.

Crosby further testified:

"Q     And now you believe that same person [who pulled a gun on you] had just shot J-Steel?

"A     No.  I just believe that the same guy that pulled the gun on me looks like the one that was dressed in the same outfit as the one who pulled a gun on him.

"Q     So that night, did you think it was the same person?

"A     That pulled the gun on me?

"Q     Yes.

"A     Yes."

Crosby testified that he did not believe defendant could be the man who shot Peterson because "[h]e's too small."  He also said, however, that he would not make an in-court identification of the man who shot Peterson even if he were able to and he was "sitting in this court right now":

"Q     Is there some sort of code that J-Steel has broken by talking to the police?

"A     I couldn't say.  We're not from the same gang when I used to gang bang, so I don't know how they do their thing.

"Q     So isn't it true that . . . you told Detective Parente you would never identify someone to the police?

"A     Exactly.

"Q     Was that a, 'yes'?

14

"A     Yes.

"Q     Why would you never identify someone to the police?

"A     I mean, as far as in someone tried to shoot or shot me?

"Q     Yeah.  Why would you never identify someone to the police?

"A     Why wouldn't I?

"Q     Yes.

"A     Just wouldn't.

"Q     Why not?

"A     Just wouldn't, sir.

"Q     Why?

"A     I just answered your question, sir; just wouldn't. . . .

"Q     Do you remember after the shooting before the trial speaking with J-Steel at some point, and J-Steel asking you to come and testify?

"A     Yes.

"Q     Isn't it true that you told J-Steel at that point, 'I'm not going to testify, because I didn't see anything?'

"A     I didn't say that.

"Q     What did you say?

"A     I said, 'I'm not going to come to court.'  I didn't say, because I didn't see anything. . . .  I told him, 'I'm not testifying on someone.  I'm not coming to court, and say, "Yeah.  This is the guy here,"' and, you know, it's not my business.  It wasn't my business.

"Q     So, sir, even if the person who pulled the gun on you was sitting in this court right now, you would not identify them?

"A     No.

"Q     So I'm going to ask that again so it's not a double negative.  If the person who pulled the gun on you that night was sitting in this court right now, would you identify them?

"A     No.

15

"Q      If the person who shot J-Steel — if you were able to recognize them, and they were sitting in this court right now, would you identify them?

"A      No.

"Q      Then why, Mr. Crosby, did you speak to the defense investigator or Detective Parente at all?

"A      Because they asked me to.  They spoke to me.  They approached me.  I just told them what I know.  I don't know who shot him.  I don't know if it's the same guy who shot him. . . .  I just told you what happened to me and what I know."


## V.      Order Denying New Trial

The trial court denied the motion for new trial on December 18, 2012.  The court explained its denial as follows:

"As summarized in the moving papers, this incident arises from a shooting that occurred on or about midnight of September 27, 2011.  Mr. Levester Peterson suffered a gunshot wound to his buttocks and lower torso, causing permanent damage to his digestive tract, legs, and urinary function.

"After a brief interview, as Mr. Peterson was being attended to and loaded for an ambulance trip to the emergency room, where Mr. Peterson identified the shooter as having a large tattoo on the neck, and being someone with whom he had interacted earlier that day — and perhaps also insulted by referring to the shooter as member of 'Pecks' — police arrested defendant, Augustine Danny Trejo.  Mr. Trejo happened to have a large tattoo on his neck, similar to what had been described by Mr. Peterson to officers.

"During the trial, Mr. Peterson identified the defendant, Trejo, as the shooter and as the person with whom there had been the earlier interaction/altercation.  Though he was the sole witness who testified to the shooting, the Court, and apparently the Jury, found Mr. Peterson to be credible.  During the trial, Mr. Peterson said that he was certain that Trejo was the man [who] shot him.  Peterson testified to having had an up-close look at Trejo, both during the shooting, earlier that same day when Trejo 'hit him up' as to which gang he (Peterson) was from, and from prior occasions when Trejo was working

16

on a car [near] the room that his mother occupied in the same hotel where Peterson stayed, and as well, when either Peterson asked Trejo, or Trejo asked Peterson[,] for a cigarette. . . . [¶] . . .

"Because of this close interaction before the shooting, Peterson got a very good look at Trejo, and tattoos displayed on Trejo's neck and head area. Immediately following the shooting, Peterson identified the shooter as a person with markings/tattoos similar to those on Trejo's head and neck area. Later, while in the hospital, Peterson identified Trejo from a photo lineup, as the shooter. At trial, Peterson testified that he did not run immediately, because, having been shot at numerous times, he knows not to run until you figure out where the bullets are coming from. Pete, or Mr. Crosby, essentially testified to the same at the hearing on the Motion for New Trial. [¶] . . .

"The Evidence is Both New and Material

"In his testimony before the court, witness Crosby gives an account of the shooting that differs slightly from the one provided by the victim Peterson. However, the more intriguing question is Crosby's account of events earlier that night, in which Crosby alleges that he was confronted by a Hispanic person larger than the defendant (but dressed similarly to the person described in Peterson's preliminary hearing and trial testimony), who pulled a gun on Crosby, and threatened to [shoot] him, while yelling racial epithets. While Crosby never goes as far as saying that Trejo was not the shooter, the clear implication is that another person, perhaps similarly dressed, actually shot Peterson. Crosby asserts that Mr. Trejo is not the person who assaulted him that night. Because he believes the same person who confronted him is the person who eventually shot Peterson on the same night, the implication is that Trejo did not shoot Peterson. Though Crosby was some 40 to 60 feet away from the shooting of Peterson, Crosby believes that the shooter was the same build and height as the person in the earlier confrontation. Crosby asserts that the shooter was wearing the same clothing — a dark hoodie sweatshirt, pulled over his head. Crosby goes on to say that when the shooting started, Peterson ran away without looking directly back at the shooter; but, rather,

17

Peterson merely looked over his shoulder, glancing in the direction of the shooter before running.

"These assertions from Crosby are strong evidence in support of a motion for new trial. But this evidence is not viewed in a vacuum. It must be examined, compared and contrasted with the prior testimony of the victim, Levester Peterson, as well as Crosby's relatively distant and obstructed view of the shooting, Crosby's unwillingness to come forward to testify, Crosby's admissions about his character and those things that he did not and could not see.

"The Evidence is not Cumulative

"The evidence is not merely cumulative, but rather, it is truly new evidence from an eye witness to the shooting. Crosby is not the best eye witness. He is an admitted gang member, habitual drug user, and convicted felon (same as victim Peterson — and in fact, a 'smoking buddy' of Peterson). But, unlike Peterson, Crosby has stated both on the record and in his interview that 'he does not get down like that,' referring to his willingness to come to court and testify and identify a suspected assailant. Moreover, on cross examination, in open court, Crosby admits that he would not testify that Trejo was the shooter, even if he was sure of that fact. During his interview with Detective Parente, Crosby further states that based on his recall, Peterson was close enough to see who was shooting at him.

"Though Crosby may have some disagreement, it is clear that Peterson obtained a better look at the shooter — even if it was just a glance. Peterson also was acquainted with Trejo, based on their past encounters. And, Peterson testified that he turned towards the sound of gunfire, and asked 'are you shooting at me?' Trejo replied 'fuck you.'

"Despite this new evidence from Crosby, the key question is the credibility and logic of Crosby's account of the incident. When compared to the other evidence presented at trial and the preliminary hearing, Crosby's account of the shooting appears flawed.

"The Defense Acted Reasonably in its Pursuit of Evidence

"At all times prior to the trial, the defense acted with reasonable diligence in the pursuit and discovery of evidence. While defense is entitled to any exculpatory evidence in the possession of the prosecution, this entitlement does not bar, preclude or inhibit the ability (or obligation of defense counsel) to reasonably pursue new evidence. In a[n] area of roughly 3.5 million people, a city of 100,000, near a four-lane highway, traversed by tens of thousands on a daily basis, the court can only conclude that it was reasonable to search, periodically, over a six month period, for a 'crackhead' known only as 'Pete.' Whether the search was done at normal business hours, during lunch breaks, and whenever possible by family members of the defendant, over a six month period (between the date that 'Pete's' name was first mentioned at the preliminary hearing, on 2-27-12, and the trial date 8-27-12), this court believes it to be reasonable. The Inglewood police department, with its resources, databases, drug and gang experts could not, and did not find Mr. Crosby. And, as Mr. Crosby tells it, it's more than a little dangerous hanging on the corners and boulevards at night in the area of the shooting, based on his account of having a gun brandished in his direction about 'every two months' and only three days before his court testimony on this motion. Thus, this Court must conclude that reasonable diligence has been shown by the defense, because to literally search for a possible witness at times other than these reasonable hours, would probably put one's life at risk.

"The Facts Shown are the Best Evidence

"Here the Court considers an account of an eye witness. One who perhaps has no interest in the outcome of the case. It is possible that just like Peterson, the past gang affiliations of Crosby are an issue, and would have been brought to the attention of the trier of fact. The same holds true for the drug use, felony convictions, and any other factors one might consider in attacking or impeaching witness testimony. Crosby has given a statement to a defense investigator, a videotaped interview to a police detective, and now live testimony in court, where he was subject to cross-examination. Thus, the fact of his existence, and presence at the scene of the shooting is not mere conjecture.

19

"The New Evidence **Would Not** Yield a Different Result at Trial

"The final factor for the Court to consider is whether the evidence would probably yield a different result during a new trial. For the reasons stated below, the Court believes that this new evidence would not yield a different result.

"Though the trial was a one-witness case, that one witness got a direct[] and close-up view of the shooter. The jury found Mr. Peterson to be credible in his identification of the defendant, as well as his past encounters with the defendant. The jury reached this conclusion despite Mr. Peterson's admission of being a habitual drug user, gang member, and felon. Unlike Crosby, Mr. Peterson has come to court to identify the person who confronted and shot him. Even Crosby admits that Peterson got both a direct and closer look at the shooter. And, in any case, Crosby admits that he would not identify the shooter, even if he knew Trejo to be the shooter.

"While Crosby got a good look at the person who pulled a gun on him, Crosby did not get a good look at the shooter in this case. Crosby's general description of the shooter's size [and] build is based [on a] view from about 50 feet away, on a dark, though moderately well lit urban street, while under the possible haze of drug use, and after the recent trauma of having a gun pointed in his face. Just like Peterson, Crosby describes the shooter as wearing a hoodie sweatshirt, though Peterson remembers the sweatshirt being down around the neck, rather than pulled over the head. Crosby never saw the shooter's face. Though Crosby states the shooter was taller than Trejo, Crosby makes this comparison of a person (Trejo) in a well-lit courtroom, as opposed to a murky figure on a dark street from 50 feet away. We do not know if Crosby wears or needs glasses. He did not have them in court, but we do not know the quality of his vision.

"Defense argues that Crosby's version of events undercuts Peterson's testimony, based on Crosby's assertion that Peterson fled the shooting without looking at the shooter. In fact, defense argues that turning to look goes against human nature. However, it was Crosby who testified that he did not turn to run when confronted with a gun to his face, stating that he did not want to be shot in the back. Just like Peterson, Crosby faced his assailant. Peterson testified at trial, explaining his looking back at the

20

shooter, that he did so due to his astonishment, and because his experience on the street taught him not to run until you knew the direction of gunfire. While human nature may be to recoil and [flee], the nature of drug-using former gang members is to face an assailant, then try to determine when, where and if it is feasible to run.

"Defense's assertion that a reasonable jury from the area around this courthouse would likely yield one or more defense votes, if not an outright acquittal, is mere speculation. A jury has seen the evidence in this case, including the testimony of Mr. Peterson, and determined it to be credible. Perhaps, some even thought it courageous, not just to face and identify the shooter, but also to do so knowing that your coming to court breaks the street 'code of silence.' Moreover, coming to court also subjected Mr. Peterson to personal attacks about his character on multiple levels (gang membership, drug use, felony convictions, loose sexual morals, jobless, homeless, and general drain on society). Mr. Peterson may be all these things, but he had the courage to come into court, face his accuser in front of a jury, and risk telling the truth, without evasion of attacks on his character and lifestyle. He, too, is entitled to justice.

"Though Crosby's testimony may have assisted the defense, in light of the victim's testimony, and Crosby's admission that he would not identify any person as the shooter, the Court must conclude that this new evidence would not have yielded a different verdict. Defense got no votes in this case. It might be different if the case was one of a hung jury, and the new evidence might support a motion to dismiss. But in this case, the jury found Peterson to be credible in all aspects, and convicted Mr. Trejo on all accounts and allegations. In light of these circumstances and for these reasons, the motion for new trial is DENIED."

On January 3, 2013, defendant made an oral request for reconsideration of the denial of the new trial motion. The trial court denied the request, saying it was comfortable with the decision denying the motion. It explained: "The court does believe that Mr. Crosby is credible in terms of what he described happened to himself that night. It's just the court's belief that Mr. Crosby was not sufficiently close to get a good look at the shooter at the time that this incident occurred[] [t]hat his testimony would be reliable

such that it exonerates Mr. Trejo in this matter.  So it's not just an issue of credibility from my perspective.  It's an issue of credibility plus factual circumstances.  Mr. Crosby was here in court and said that . . . when he looked up and saw the shooter, the shooter was from where — some approximate distance from where he would be sitting in the witness chair to some place out in the hallway which the court estimated about 50 feet.  And given the circumstances, the alleged date and time of the incident, it was near midnight on Manchester, busy street, reasonably well lit for an urban area but not so well lit that you could [see] the face of a person from 50 feet away with any reliability, especially when that person is wearing a hoodie covering his or her head, neck area.  I think the jury considered all that evidence and the jury reached the right decision based upon what was presented here in court at the time.  Even if we were to add Mr. Crosby's testimony [to] what the jury heard, the court still believes the jury would reach the same conclusion.  So it's on that basis the court denied the motion for the new trial."

Defendant timely appealed.

## DISCUSSION

### I.      Legal Authority

The authority to grant a criminal defendant a new trial is found in section 1181. Subdivision 8 of section 1181 provides that a criminal defendant is entitled to a new trial "[w]hen new evidence is discovered material to the defendant, and which he could not, with reasonable diligence, have discovered and produced at the trial."

"'In ruling on a motion for new trial based on newly discovered evidence, the trial court considers the following factors:  "'1. That the evidence, and not merely its materiality, be newly discovered; 2. That the evidence be not cumulative merely; 3. That it be such as to render a different result probable on a retrial of the cause; 4. That the party could not with reasonable diligence have discovered and produced it at the trial; and 5. That these facts be shown by the best evidence of which the case admits.'"
[Citations.]' (*People v. Delgado* (1993) 5 Cal.4th 312, 328.)  'In addition, "the trial court

22

may consider the credibility as well as materiality of the evidence in its determination [of] whether introduction of the evidence in a new trial would render a different result reasonably probable." [Citation.]' (*Id*. at p. 329.)" (*People v. Howard* (2010) 51 Cal.4th 15, 43.)

"[W]hen a defendant makes a motion for a new trial based on newly discovered evidence, he has met his burden of establishing that a different result is probable on retrial of the case if he has established that it is probable that at least one juror would have voted to find him not guilty had the new evidence been presented." (*Soojian*, *supra*, 190 Cal.App.4th 491, 521.) A "probability" in this context "'does not mean more likely than not, but merely a *reasonable chance*, more than an *abstract possibility*. ([*People v. Watson* (1956) 46 Cal.2d 818,] 837; cf. *Strickland v. Washington* (1984) 466 U.S. 668, 693-694, 697, 698 ["reasonable probability" does not mean "more likely than not," but merely "probability sufficient to undermine confidence in the outcome"].)' (*College Hospital, Inc. v. Superior Court* (1994) 8 Cal.4th 704, 715.)" (*Soojian*, *supra*, at p. 519.)

"Numerous cases hold that a motion for a new trial should be granted when the newly discovered evidence contradicts the strongest evidence introduced against the defendant." (*People v. Martinez* (1984) 36 Cal.3d 816, 823 (*Martinez*).) "'"Applications on this ground are addressed to the discretion of the court below, and the action of the court below will not be disturbed except for an abuse of discretion . . . ."'" (*People v. Sutton* (1887) 73 Cal. 243, 247-248, quoting 1 Hayne on New Trial and Appeal, §§ 87-88.)" (*Martinez*, *supra*, at p. 821.)

The trial court has broad discretion to grant or deny a motion for new trial. For example, in *People v. Verdugo* (2010) 50 Cal.4th 263 (*Verdugo*), the defendant was convicted of a double murder and sentenced to death. One of the witnesses against him at trial was his former sister-in-law, Donna Tucker, who testified that the defendant told her that he "'killed two guys,'" a man and a woman, after leaving a party. (*Id*. at p. 271.) Tucker said she subsequently showed the defendant a newspaper article about a murder and asked whether it was the one defendant had told her about, and he said, "'Yeah,

that's the one.'" (*Id*. at p. 272.) Tucker said the defendant said about the killings that "'he got a rush off of that, that it felt really good.'" (*Ibid*.)

Following his conviction, the defendant filed a motion for new trial, relying in significant part on letters Tucker had written to the defendant's sister Pauline. Among other things, the letters suggested that Tucker was planning to have or was having a romantic relationship with a detective involved in the case and had been promised reward money. (*Verdugo*, *supra*, 50 Cal.4th at p. 306.) There was an extensive evidentiary hearing, at which Tucker confirmed she had written the letters, but said she was never romantically involved with the detective. She said she had lied in her letters because she wanted the defendant's family to think she had police protection. Tucker also testified that she falsely told Pauline she was promised reward money because she was hoping to convince Pauline that she would take care of her. The detective testified that his relationship with Tucker had been professional, and that he became aware that she was interested in him romantically only when he learned of her letters to Pauline. (*Id*. at p. 307.)

The trial court denied the new trial motion. The court found Tucker's and the officer's hearing testimony credible, and it said that given what the trial evidence had revealed about the defendant's family—i.e., that the defendant's family had threatened Tucker's life (*Verdugo*, *supra*, 50 Cal.4th at p. 283)—Tucker's explanation made "'a lot of sense.'" The court also credited Tucker's explanation of her contradictory assertion to Pauline that she had been promised the reward. (*Id*. at p. 308.)

The Supreme Court affirmed the denial of the motion for new trial. It explained that newly discovered evidence supports the grant of a new trial only if a different result is probable on retrial. (*Verdugo*, *supra*, 50 Cal.4th at p. 308.) The trial court "'has broad discretion in ruling on a new trial motion,' and its 'ruling will be disturbed only for clear abuse of that discretion.'" (*Ibid*.) The reviewing court "'accept[s] the trial court's credibility determinations and findings on questions of historical fact if supported by substantial evidence.'" (*Ibid*.) In the case before it, the Supreme Court held the trial court did not err in concluding that Tucker's letters did not provide a basis for granting a

new trial. It explained: "Although certain statements in Tucker's letters are troubling, the court found her explanations of those statements to be credible, and substantial evidence in the form of her testimony and that of other witnesses supports this credibility determination." (*Ibid.*) Thus, "'Defendant has shown no manifest and unmistakable abuse of discretion in the trial court's ruling [on the new trial motion]. No basis for reversal appears.'" (*Id.* at p. 309.)

## II. The Trial Court Did Not Abuse Its Discretion by Denying Defendant's Motion for New Trial

The trial court found that four of the five factors relevant to a new trial weighed in defendant's favor: (1) the evidence was newly discovered, (2) the evidence was not merely cumulative, (3) defendant could not with reasonable diligence have discovered and produced the evidence at trial, and (4) the facts were shown by the best evidence available. Neither party challenges these findings on appeal, and we conclude that the trial court's findings as to these factors were well within its broad discretion.

We turn therefore to the final factor—"""[t]hat [the evidence] be such as to render a different result probable on a retrial of the cause.""" (*People v. Delgado*, *supra*, 5 Cal.4th at p. 328.) As to this factor, defendant contends the trial court abused its discretion in denying a new trial because Crosby's testimony made a different result on retrial reasonably likely. For the reasons that follow, we disagree.

Peterson's identification of the man who shot him was clear and unwavering. He described the shooter to officers on the scene immediately after he was shot and immediately picked defendant out of a photo lineup while in the hospital. He identified defendant both at the preliminary hearing and at trial, and he testified that the area where he was shot was well lit and he was able to the see the shooter clearly.

Further, several factors pointed to the likely accuracy of Peterson's identification of the shooter. Peterson testified that he had seen and/or spoken to defendant four times before the shooting—twice in the parking lot of the Lotus Motel several weeks before the shooting, on the street several days before the shooting, and about an hour before the

25

shooting, when defendant inquired about Peterson's gang affiliation and asked him for a cigarette. Moreover, immediately before the shooting, Peterson saw the shooter close up (from a distance of about five feet) and exchanged words with him ("I'm like, 'What's up, dog. You shooting at me?' He said, 'Yeah. Fuck you, homes.'"). As a result, Peterson said, when defendant began shooting, he recognized him immediately.

The trial court found Peterson credible, noting in its new trial order that "[t]hough he was the sole witness who testified to the shooting, the Court, and apparently the Jury, found Mr. Peterson to be credible." Further, the court said, "A jury has seen the evidence in this case, including the testimony of Mr. Peterson, and determined it to be credible. Perhaps, some even thought it courageous, not just to face and identify the shooter, but also to do so knowing that your coming to court breaks the street 'code of silence.' Moreover, coming to court also subjected Mr. Peterson to personal attacks about his character on multiple levels (gang membership, drug use, felony convictions, loose sexual morals, jobless, homeless, and general drain on society). Mr. Peterson may be all these things, but he had the courage to come into court, face his accuser in front of a jury, and risk telling the truth, without evasion of attacks on his character and lifestyle. He, too, is entitled to justice." We do not disturb this credibility finding on appeal.

In contrast to Peterson's clear, consistent identification of defendant as the shooter, Crosby's testimony was both inconsistent and equivocal. At various points, Crosby said he believed the man who shot Peterson was the same man who had pulled a gun on him less than an hour earlier. At other times, however, Crosby said he "didn't say that" the person who pulled the gun on him was the same person who shot Peterson, he did not know who the shooter was, and he did not believe that the person who pulled the gun on him was the same person who shot Peterson.

Further, by his own admission, Crosby was further away from the shooter than Peterson was, and all Crosby could see of the shooter was a "tall black figure, 50 feet away, shooting." Crosby said he could not see the shooter's face and could not determine the shooter's race or ethnicity. Indeed, Crosby said, when the shooting began, he got

26

down on the ground and put his hands over his head.  In contrast, he said, "When he [Peterson] looked back he *knew* who was chasing him."

Crosby also admitted that even if he could positively identify the shooter, he *would not do so* because it's "not my business":

"Q  So, sir, even if the person who pulled the gun on you was sitting in this court right now, you would not identify them?

"A  No.

"Q  So I'm going to ask that again so it's not a double negative.  If the person who pulled the gun on you that night was sitting in this court right now, would you identify them?

"A  No.

"Q  *If the person who shot J-Steel — if you were able to recognize them, and they were sitting in this court right now, would you identify them?*

"A  *No*." (Italics added.)

On the basis of all of this testimony—including Crosby's statement that "he would not identify any person as the shooter"—the trial court concluded that "this new evidence would not have yielded a different verdict."  This conclusion was supported by substantial evidence, and thus we do not disturb it on appeal. (*Verdugo*, *supra*, 50 Cal.4th at p. 308.)

Defendant cites two cases in which appellate courts reversed denials of new trial motions, urging that Crosby's testimony was at least as strong as the newly discovered evidence in those cases and thus warranted a new trial.  We do not agree.  In the cases on which defendant relies, the newly discovered testimony "*contradict[ed]* the strongest evidence introduced against the defendant." (*Martinez*, *supra*, 36 Cal.3d at p. 823, italics added [new evidence contradicted testimony that drill press had been repainted the day it was stolen and thus provided an innocent explanation for defendant's palm print on the drill press]; *People v. Williams* (1962) 57 Cal.2d 263, 271 [disinterested witness's affidavit provided defendant "with a complete defense" because it refuted sole witness's story in its entirety].)  In the present case, in contrast, Crosby's testimony was too

equivocal to contradict Peterson's testimony—although Crosby at some points suggested that he did not believe defendant was the shooter, at other times he said he had not seen the shooter's face and could not identify the shooter. Crosby testified, moreover, that Peterson *had* seen the shooter and likely could identify him. ("If that's what [Peterson] said who shot him — I didn't say he *wasn't* the one who shot him. I said it didn't look like the guy who pulled a gun *on me*.") The trial court thus did not abuse its discretion in concluding that Crosby's testimony did not "contradict[]" Peterson's.

Defendant also contends that the trial court applied the wrong legal standard, noting that the trial court identified the issue before it as "whether the evidence would *probably* yield a different result during a new trial." (Italics added.) We conclude that the trial court's articulation of the standard was not materially different from the standard articulated by our Supreme Court—that the new evidence be such "'""'as to render a different result *probable* on a retrial'"'"" (*People v. Howard*, *supra*, 51 Cal.4th at p. 43, italics added)—and thus it does not suggest that the trial court applied the wrong legal standard. We also reject defendant's suggestion that the trial court believed it could not grant a new trial unless an acquittal was likely on retrial. Nothing in the new trial order suggests that the trial court was unaware that a defendant has met his burden of establishing that a different result is probable on retrial of the case "if he has established that it is probable that at least one juror would have voted to find him not guilty had the new evidence been presented." (*Soojian*, *supra*, 190 Cal.App.4th at p. 521.)

## DISPOSITION

The judgment of conviction and postjudgment order denying Trejo's motion for new trial are affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EDMON, J.[*]

We concur:

EPSTEIN, P. J.

MANELLA, J.

---

[*]Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.